**Randall L. WOODRUFF, Plaintiff,**

v.

**Gregory A. WILSON, Jo Ann Mason, Gerald Coleman, Suzanne Hornstein, Clara McGee, Karen Powers, Robert Stark, Margaret Ellis, Avona Connell, Peter Sybinsky, Judith Becherer, Karen Davis, Debra Wilson, Diane Webster, Peter Sybinsky, Defendants.**

No. 1:00–cv–00306–LJM–JMS.

United States District Court,
S.D. Indiana,
Indianapolis Division.

April 27, 2007.

William P. Tedards, Jr., Washington, DC, William Edwin Wendling, Jr., Campbell Kyle Proffitt LLP, Carmel, IN, for Plaintiff.

Barbara A. Nardi, Melinda C. Frick, Indiana State Attorney General, Indianapolis, IN, for Defendants.

### ORDER ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

McKINNEY, Chief Judge.

This cause is now before the Court on defendants', Jo Ann Mason ("Mason"), Gerald Coleman ("Coleman"), Suzanne Hornstein ("Hornstein"), Clara McGee–Vinzant ("McGee"), Karen Powers ("Powers"), Robert Stark ("Stark"), Margaret Ellis ("Ellis"), Avona Connell ("A. Connell") and Karen Davis ("Davis") (collectively, "Defendants"), Motion for Summary Judgment. Plaintiff, Randall L. Woodruff, as Bankruptcy Trustee for Legacy Healthcare, Inc., ("Legacy"), opposes the motion.

For the reasons discussed herein, the Court **GRANTS** Defendants' Motion for Summary Judgment.

### I. COUNTS 5 THROUGH 8

In its brief, Legacy voluntarily dismisses Counts 5 through 8 of it Second Amended Complaint. Those Counts are hereby **DISMISSED without prejudice.**

### II. DEFENDANTS' EVIDENTIARY OBJECTIONS

Defendants contend that Legacy's brief and evidentiary offerings do not comply with Federal Rule of Civil Procedure 56(e) ("Rule 56(e)") or U.S. District Court for the Southern District of Indiana Local Rule 56.1 ("Local Rule 56.1"). Defendants argue that the Court should require strict compliance with Rule 56(e) and Local Rule 56.1. In doing so, Defendants urge the Court to ignore all the improperly designated evidence, assume the facts as claimed by Defendants and supported by admissible evidence exist without controversy, and grant summary judgment in their favor. Moreover, Defendants object to Douglas Bradburn's declaration ("Bradburn declaration"), because "the document as a whole is a pro-

lix mass of suspicion, opinion, conclusory statements, speculation, hearsay, bald assertions of facts unsupported by specific evidence, and rambling accounts of matters that have already been decided. . . ." Defs.' Reply, at 3–4. Defendants urge the Court to ignore the entirety of Bradburn's declaration, and to consider only specific exhibits identified in Legacy's brief.

Although the Court agrees that many statements in Bradburn's declaration are conclusory and, to some extent, are opinion, the Court, in its discretion, declines Defendants' invitation to disregard all the evidence proffered by Legacy. Other than one reference to Bradburn's declaration in general, which the Court agrees is inappropriate, in each section of its brief Legacy points to paragraphs in Bradburn's declaration that it believes supports its allegations against defendants. *See, e.g.,* Pl.'s Br. in Opp'n, at 1–3 (setting out general facts relevant to all claims); Pl.'s Br. in Opp'n, at 5–10 (setting out facts relevant to Legacy's claim under the First Amendment). Bradburn either sets forth conclusions, opinion, facts or citations to other evidence in support of the statements in the brief. This is enough roadmap for the Court to determine both whether the evidence is admissible and whether there is a genuine issue of material fact on Legacy's remaining Counts. However, the Court shall not consider statements in Bradburn's declaration to which there is only the general reference or statements for which no specific citation exists in the brief. As to those averments the Court will consider, the Court shall apply the normal rules of evidence to determine admissibility of each statement proffered. In some cases the Court may rephrase Bradburn's statement to preserve its admissibility.

In order for there to be no mistake about what paragraphs of Bradburn's dec-

laration were considered by the Court, to the extent the content is admissible under Rule 56(e), the Federal Rules of Evidence, and Seventh Circuit law, the paragraphs considered are listed here: 7, 16–32, 35–38, 51, 54–55, 57–58, 60, 62–73, 88–89, 98, 100–283, 290, 352–453, 491–513, 535–41, 607–23. The Court also considered the exhibits cited to in those paragraphs, and Legacy's exhibits 172, 10 and 3, as those exhibits were specifically referenced by Legacy in its brief.

## III. BACKGROUND

In this suit Legacy has four remaining claims: (1) that Defendants retaliated against it for exercising its First Amendment right to participate as either plaintiff or defendant in litigation against the State of Indiana; (2) that Defendants conspired to retaliate against it for exercising its First Amendment right to participate in litigation against the State of Indiana; (3) that Defendants systematically denied Legacy equal protection under federal and state laws, regulations and guidelines; and (4) that Defendants conspired to deny Legacy equal protection under federal and state laws, regulations and guidelines. Defendants filed the instant motion to challenge Legacy to show material questions of fact on its claims. In addition, Defendants challenge Legacy to show that some of its claims are not barred by the statute of limitations, that some of its claims are not barred by collateral estoppel, that certain Defendants, namely, Mason and Davis, are not entitled to absolute immunity, and that certain Defendants, namely, Coleman, Hornstein, McGee, Powers, Stark, Ellis and Connell, are not entitled to qualified immunity.

Because the Medicaid and Medicare regulatory scheme provides the backdrop for all of the alleged deprivations of rights in

this case, the Court starts with that framework.

## A. THE RELEVANT MEDICAID & MEDICARE REGULATORY SCHEME

The Indiana Family and Social Services Administration ("FSSA") administers Indiana's Medicaid program though its Office of Medicaid Policy and Planning ("OMPP"). Ind.Code § 12–15–1–1. Federal Medicaid law requires OMPP to designate a survey agency to inspect healthcare facilities to ensure compliance with the Medicaid program. 42 U.S.C. §§ 1396a(a)(9) & (33). Under Indiana law, the Indiana State Department of Health ("ISDH") is authorized to perform the duties of the state survey agency for the Medicaid program. Ind.Code § 16–28–12–1.

As Indiana's Medicaid survey agency, ISDH determines whether institutions, like Legacy, and agencies meet the requirements for participation in the Medicaid program. 42 CFR § 431.610(e)(1); 42 CFR § 488.330(a). Surveyors who perform surveys under the auspices of ISDH are to use their judgment, in concert with federal forms and procedures, to determine whether a facility is in compliance. 42 CFR § 488.26(c)(3).

More specifically, for nursing facilities that receive Medicare or Medicaid reimbursement, ISDH must certify that the facility complies "with the conditions of participation, requirements (for [skilled nursing facilities,] SNFs and [nursing facilities,] NFs), and conditions of coverage." 42 CFR § 488.1. To be approved for participation in, or coverage under, the Medicare program, a prospective provider or supplier must: (1) meet the applicable statutory definition in section 1138(b), 1819, 1832(a)(2)(F), 1861, 1881, or 1919 of the Social Security Act; and (2) must be in compliance with the applicable conditions

or long-term care requirements prescribed in subpart N, Q, or U of part 405, 416, subpart C of part 485, subpart A of part 491, or part 494 of chapter 42 of the Code of Federal Regulations ("CFR"). 42 CFR § 488.3(a). In addition, the provisions of part 483 subpart B contain the requirements that an institution must meet in order to qualify to participate as a SNF in the Medicare program and as an NF in the Medicaid program. 42 CFR § 483.1(b). These requirements serve as the basis for survey activities for the purpose of determining whether a facility meets the requirements for participation in Medicare and Medicaid. *Id.*

The State of Indiana certifies compliance or non-compliance of non-State operated NFs, SNFs and dually-participating SNF–NFs. 42 CFR § 488.330(a)(1)(i). According to the regulations, "substantial compliance" means a level of compliance with the requirements of participation such that any identified deficiencies pose no greater risk to resident health or safety than the potential for causing minimal harm. 42 CFR § 488.301. "Immediate jeopardy" means a situation in which the provider's noncompliance with one or more requirements of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to a resident. *Id.*

ISDH must conduct a standard survey of each SNF and NF not later than fifteen months after the last day of the previous standard survey. 42 CFR § 488.308(a). However, ISDH may conduct surveys as frequently as necessary to—(1) determine whether a facility complies with the participation requirements; and (2) confirm that the facility has corrected deficiencies previously cited. 42 CFR § 488.308(c).

Federal regulations provide for several types of surveys including: standard surveys, which are periodic in nature and are resident-centered and quality focused to

determine compliance with the requirements for participation; abbreviated standard surveys, which are non-standard surveys that may be premised on complaints received, a change of ownership, management or director of nursing, or other indicators of specific concern; extended surveys, which are performed subsequent to a substandard, standard survey and evaluates additional participation requirements; and partial extended surveys, which are performed subsequent to a substandard, abbreviated standard survey and evaluates additional participation requirements. 42 CFR § 488.301. Federal regulations also provide for special surveys in which ISDH

> must review all complaint allegations and conduct a standard or an abbreviated standard survey to investigate complaints of violations of requirements of [long term care facilities] if its review of the allegations concludes that—(i) A deficiency in one or more of the requirements may have occurred; and (ii) Only a survey can determine whether a deficiency or deficiencies exist.

42 CFR § 488.308(e)(2).

ISDH may perform any of these surveys on SNFs, NFs or intermediate care facilities for the mentally retarded ("ICF/MR"). 42 CFR § 442.109(a). The federal regulation provides that ISDH "may certify a facility that fully meets applicable requirements for up to [twelve] months." *Id.*

Once an ICF/MR is certified and ISDH has notified the Medicaid agency, the Medicaid agency executes a provider agreement under 42 CFR § 442.12. *See* 42 CFR § 442.101 (stating the requirements for obtaining certification before a Medicaid agency may execute a provider agreement). Conditions for participation by an ICF/MR are specifically set forth in subpart I of part 483 of chapter 42 of the CFR. *Id.* § 442. 101(d)(1), however, there are three certification levels for an ICF/MR, all of which are laid out in the federal

regulation. *Id.* For example, if ISDH finds an ICF/MR deficient in meeting the standards as specified under subpart I of part 483, the agency may certify the facility for Medicaid if "(i) [a]ll conditions of participation are met; and (ii)[t]he facility submits an acceptable plan of correction covering the remaining deficiencies, subject to other limitations specified in § 442.105." *Id.* But, "[t]he failure to meet one or more of the application conditions of participation is cause for termination or non-renewal of [a] ICF/MR provider agreement." *Id.* § 442.101(e).

The regulations also provide for immediate termination of an ICF/MR from the Medicaid system if ISDH determines that immediate jeopardy exists and the facility does not immediately take corrective action. 42 CFR § 442.117. "Immediate jeopardy means a situation in which immediate corrective action is necessary because the provider's compliance with one or more requirements of participation or conditions of participation has caused, or is likely to cause, serious injury, harm, impairment, or death to an individual receiving care in a facility." 42 CFR § 442.2.

If a facility's deficiencies do not pose immediate jeopardy, but the facility is not in substantial compliance, ISHD may allow the facility to continue to participate in Medicaid or Medicare for no longer than six months. 42 CFR § 488.412(a).

In addition to these federal requirements, a facility must be licensed by ISDH to receive Medicare. 42 U.S.C. § 1395i-3(d)(2)(A). A facility may receive a license from the director of ISDH's Division of Long Term Care ("DLTC"). Ind.Code § 16–18–2–1; 410 IAC § 16.2–3.1–2. Indiana law further provides that licensing inspections of healthcare facilities must be made regularly and annually. Ind.Code § 16–28–1–13(a); 410 IAC § 16–3.1–4(c)(1).

A healthcare facility that is aggrieved by an adverse decision of the ISDH may request an administrative hearing. Ind. Code § 16–28–5–3. That hearing is conducted in accordance with the Indiana Administrative Orders and Procedures Act ("AOPA"), which is found at Indiana Code §§ 4–21.5, et seq. An administrative law judge ("ALJ") for an ISDH proceeding must be a lawyer licensed to practice in Indiana, and must not be employed by the State of Indiana. Ind.Code § 16–28–10–1. Any party who disagrees with the decision of the ALJ in an ISDH proceeding may request review by an appeals panel. Ind. Code §§ 16–28–10–1 & –2. The appeals panel is appointed by the executive board of the ISDH and consists of one member of the executive board, one attorney admitted to practice law in the State of Indiana, and one individual with qualifications determined by the executive board. Ind. Code §§ 16–28–10–1 & –2. Either the facility or the State may petition for judicial review of an adverse decision of the appeals panel. Ind.Code § 16–28–10–3.

With respect to Medicaid, in Indiana, any long-term care facility that wants to obtain Medicaid reimbursement for residents who are Medicaid recipients must have a provider agreement with OMPP. Ind.Code §§ 12–15–11–2 & –3. Moreover, OMPP may not issue a provider agreement unless the ISDH has certified the facility to provide those services. 42 CFR § 442.12(a). OMPP must received notice of the certification from ISDH before it issues a provider agreement. 42 CFR § 442.101(c).

Pursuant to State law, among other penalties, OMPP may terminate a provider's Medicaid provider agreement if the provider has violated Medicaid statutes or rules. Ind.Code § 12–15–22–1(3).

Any provider who is aggrieved by a decision of the OMPP may obtain an administrative hearing that is conducted in accordance with the AOPA. See Ind.Code § 12–15–22–2; 405 IAC 1–1.5. An ALJ for an OMPP administrative proceeding may be an employee of the agency. 405 IAC 1–1.5–4. A party that disagrees with the decision of an OMPP ALJ may request agency review. 405 IAC 1–1.5–2. Agency review is performed by the Secretary of FSSA or the Secretary's designee. 405 IAC 1–1.5–4(a). A party who disagrees with the Secretary's final action may file a petition for judicial review pursuant to Indiana Code § 4–21.5. Ind.Code § 12–15–22–3; 405 IAC 1–1.5–2.

## B. THE PARTIES

Legacy[1] is a privately held, Indiana company that operated several long term care facilities in the State. Second Am. Compl. ¶ 5. Bradburn asserts that during the period between 1953 and 1984 Legacy's, or its predecessors', record of services was impeccable. Bradburn Decl. ¶ 7. He states that Legacy easily passed inspections by ISDH and the company's facilities enjoyed a good reputation. Id.

Jo Ann Mason worked as a Deputy Attorney General ("DAG") from July 1995 until approximately December 12, 1997. Mason Decl. ¶ 4. As a DAG, Mason represented the Indiana State Department of Health ("ISDH") in litigation involving Community Care Centers, Inc. ("CCC"), and its successor, Legacy. Id. On December 12, 1997, Mason was employed at ISDH as Director of the Office of Legal Affairs, and remained in that position until

---

1. The plaintiff is Bankruptcy Trustee, Randall L. Woodruff, who on August 12, 2003, was substituted for the original plaintiff, Legacy Healthcare, Inc., as the real party in interest.

Second Am. Compl. ¶ 5. Because the entity is the allegedly aggrieved party, for simplicity the Court uses Legacy as the plaintiff party in this Order.

December 1, 2000, when she left employment with the State of Indiana. *Id.* ¶ 5.

From February 1999, through April 2000, Mason also supervised the Office of Policy for ISDH. *Id.* ¶ 6. The Policy staff was not involved in any enforcement action or survey involving Legacy nor with any other matters directed specifically toward Legacy. *Id.* ¶ 18. Furthermore, at no time during her employment as a DAG or as the Director of Legal Affairs at ISDH did Mason serve or act in any capacity other than as an attorney. *Id.* ¶ 17. In those positions, Mason asserts that she exercised professional legal judgment in advising her clients in their dealings with Legacy. *Id.*

On December 29, 1994, Gerald Coleman was employed as the Director of Risk Management for the Regulatory Services division of ISDH. Coleman Decl. ¶ 3. From February 24, 1997, through January 4, 2002, he was the Assistant Commissioner of the Heath Care Regulatory Services division of the ISDH. *Id.* Coleman assisted as counsel on the 1996 licensure action against CCC of North Vernon, Cause No. C–536–96, while at ISDH. *Id.* ¶ 7.

In March 1986, Suzanne Hornstein was employed in the Long Term Care division as a Program Director 2 who had responsibility for certification. Hornstein Decl. ¶ 5. Hornstein was promoted to Program Director I in November 1986, where she remained until July 1990. *Id.* On September 24, 1994, she was appointed as the Division Director of Long Term Care at ISDH and is still employed in that capacity. *Id.*

Clara McGee–Vinzant was employed by ISDH in the Intermediate Care Facility for the Mentally Retarded–Developmentally Disabled program ("ICF/MR–DD") in the division of Long Term Care. McGee Decl. ¶ 3. From March 4, 1994, to April 24, 1994, she was a Medical Surveyor 3. *Id.* On April 24, 1994, she was promoted to Program Director 2 in the ICF/MR–DD. *Id.* McGee held that position until she left state employment on June 28, 2002. *Id.*

Karen Powers is currently employed by ISDH, Division of Long Term Care, as a Surveyor Supervisor 5, and was in that position at all times relevant to this case. Powers Decl. ¶ 3.

Robert Stark, now deceased, started working for ISDH in November 1992 as a Public Health Nurse Surveyor 3 and still held that position in 1999. Defs.' Exh. 6.

Margaret Ellis was employed at ISDH as a Public Health Nurse Surveyor from May 16, 1998 until November 8, 1993, and as a Surveyor Supervisor from November 8, 1993, until August 24, 1994. Ellis Decl. ¶ 3. After leaving employment with ISDH for a period of time, Ellis returned to ISDH as a Surveyor from August 1, 1995, until her retirement on November 30, 2001. *Id.*

On September 14, 1992, Avona Connell was hired by ISDH as a Public Nurse Surveyor in the Division of Long Term Care. A. Connell Decl. ¶ 3. She was in this position at all times relevant to this case. *Id.*

In September 1990, Karen Davis began her employment with FSSA, formerly known as Indiana Department of Public Welfare ("DPW"), as a staff attorney for the FSSA Office of General Counsel. Davis Decl. ¶ 4. In that position, Davis concentrated on issues concerning Medicaid. *Id.* In March 1993, Davis became the Deputy General Counsel for the same issues. *Id.* In December 1997, she became General Counsel for FSSA and remained in that position until she left the agency in June 2002. *Id.*

At her deposition of May 31, 2006, Davis recalled defending FSSA in an audit matter involving CCC and Legacy. Pl.'s Exh. 3, at 6. She also admitted in her deposition

that she advised FSSA in its refusal to enter into a provider agreement with New Horizon in early 1994. *Id.* at 7 & 9.

On or about April 4, 1997, Bradburn learned that Davis had contacted loan officers at Bank One, Old National Bank, and National City Bank, who handled CCC's accounts. Bradburn Decl. ¶ 98.

## C. REGULATORY ACTIONS & LITIGATION BETWEEN LEGACY & STATE REGULATORY AGENCIES DURING THE PERIOD FROM 1988 TO 1996[2]

### 1. *Rate System Litigation*

In 1988, DPW promulgated a change to the reimbursement rule, called Rule 4.2. Bradburn Decl. ¶ 21. Under the new rate structure, Legacy realized that it could not sustain its business. *Id.* ¶ 16. It was at this point that Legacy took the opportunity to initiate litigation targeted at getting DPW to follow the enabling statute, as well as its own promulgated rules. *Id.* Basically, Legacy took issue with DPW's policy to reimburse existing facilities at a lower rate than newer or newly purchased facilities. *Id.* ¶ 23. Legacy filed its suit in Delaware Superior Court II based on its CCC facility. *Id.* ¶ 21. Before the case was venued out to the Blackford County Superior Court ("Blackford County suit"), the Delaware County Court issued a temporary restraining order that prevented DPW from using its rates for CCC. *Id.* ¶¶ 21–22.

In the Blackford County suit, DPW argued, in part, that Legacy's management was misusing Medicare and Medicaid funds, therefore, its refusal to pay Legacy's facilities more was justified. *Id.* ¶¶ 24–25 Specifically, DPW argued that Legacy's purchase of an airplane and the

salaries of Legacy's management evidence misuse of funds. *Id.* However, the Blackford County court found against DPW and enjoined it from using the Maximum Annual Limit as "the sole determinate of the rate." *Id.* ¶ 27. This outcome did not affect DPW's ability to use the rest of its rate system, which limited expenditures to allow only reasonable costs. *Id.*

After the lawsuit, Legacy claims that DPW devised and implemented a completely different rate system for Legacy's CCC facility. *Id.* In addition, DPW appealed the ruling in the Blackford County suit. *Id.* ¶ 29. Apparently because the issues in the Blackford County suit were similar to those pending before the Indiana Supreme Court in a class action suit called Tioga Pines, the suit was consolidated with the Tioga Pines suit on appeal. *Id.* On October 29, 1993, the Indiana Supreme Court ruled that the rate system was valid, overturning both lower court rulings. *Id.*

Shortly thereafter, Davis, on behalf of DPW, which by then was FSSA, went back to the Blackford County court to seek recoupment of the monies it had paid to Legacy during the period of the injunction. *Id.* ¶ 30. After seeking clarification from the Supreme Court, the Blackford County court declined FSSA's request. *Id.*

The Court notes that FSSA settled its claims for recoupment against the Tioga Pines plaintiffs, with terms favorable to the facilities. *Id.* ¶ 32. Although Legacy challenged that settlement agreement arguing its CCC facility was improperly excluded from it, it lost. *Id.* ¶ 32 & n. 3. In addition, Legacy was ordered to pay attorneys fees and costs for the Tioga Pines class action litigation. *Id.* ¶ 32 n. 3.

---

2. The Court notes that from here on the majority of the facts presented were taken from Legacy's proffered evidence in keeping with the requirement for summary judgment motions that the facts are taken in the light most favorable to the non-moving party.

Meanwhile, FSSA filed an equitable restitution suit in Delaware County seeking to recoup the excess monies it felt it had paid Legacy. *Id.* Legacy fought the recoupment. *Id.* ¶¶ 30–31. However, it lost on summary judgment at the trial court level. *Id.* ¶ 34.

On summary judgment, FSSA argued that the court should pierce the corporate veil to hold Legacy's owners, Bradburn's parents, personally liable for the funds. *Id.* ¶ 35. FSSA contended that Legacy's owners had used the corporation to commit a fraud on the agency. *Id.* The trial court agreed and judgment was entered against Legacy's owners, which encumbered all the owners' assets and any funds to be paid by Legacy to the owners. *Id.*

Legacy appealed the recoupment judgment. *Id.* ¶ 36. On September 5, 2002, the Indiana Court of Appeals reversed the decision of the trial court. *Id.*

### 2. *New Horizon Conversion from NF to ICF/MR*

Also beginning in the late 1980s, Legacy attempted to convert its New Horizon facility from an NF to an ICF/MR; however, because of ISDH's reimbursement rate structure, Legacy's facility would not survive long enough to pass the certification process, therefore, Legacy sued ISDH in federal court. *Id.* ¶ 51. In essence, Legacy argued that it should be paid a higher rate during the conversion to an ICF/MR than the NF rate. *Id.* FSSA argued that it should not be forced to pay Legacy the extra amount because all Legacy had to do was become an ICF/MR, and then it would be entitled to the higher amount. *Id.* Although Legacy won in the trial court, it lost on appeal. The appellate decision was rendered on June 1, 1992. *Lett v. Magnant,* 965 F.2d 251 (7th Cir.1992).

Legacy contends that what neither the trial court nor the appellate court knew when ruling in that case, was that, while FSSA was arguing that Legacy's remedy was to get certified as an ICF/MR, ISDH was obstructing conversion of the New Horizon facility from an NF to an ICF/MR and the corresponding certification process. Bradburn Decl. ¶ 51. Despite using its best efforts to follow the rules set by ISDH for the conversion, the process took nearly six years, at least one administrative proceeding, and three law suits. *Id.*

Specifically, in the administrative proceeding, ongoing from November 1988 to March 1989, Legacy won the right to make the conversion. *Id.* Over the next two year period, Legacy contends that ISDH manipulated the process and conversion standards such that it was impossible for Legacy to get the conversion approved. *Id.* In March 1992, after ISDH had moved to decertify the New Horizon facility completely, Legacy filed for a temporary restraining order to halt the process. *Id.* Legacy argued that, through their shifting policies and standards, FSSA and ISDH were forcing Legacy to operate two different facilities simultaneously within one facility. *Id.* The court issued the temporary restraining order and set a hearing for later in the month. *Id.* However, the parties reached a settlement that (1) dissolved the temporary restraining order, (2) had ISDH/FSSA agree to accept a partial ICF/MR application from the New Horizon facility as agreed to by the agencies before the decertification process began, (3) had Legacy submit a Plan of Correction to the last survey performed by ISDH as if there were distinct NF and ICF/MR parts of the New Horizon facility, (4) had ISDH agree to take no adverse action based on the last survey, and (5) had Legacy agree not to link ISDH with FSSA in future dealings. *Id.*

Legacy continued its efforts to comply with the State standards that Bradburn alleges were constantly changing. *Id.* But,

on September 4, 1992, residents of New Horizon file a class action law suit against the State in which they allege that New Horizon had been denied wrongfully the funds necessary to keep services at an acceptable level. *Id.*

Legacy again resubmitted a conversion application that the State finally approved in February 1993. *Id.* Documentation on the certification was delayed until June 1993. *Id.* In addition, despite having been certified by ISDH as an ICF/MR, FSSA refused to recognize New Horizon's certification and refused to sign a provider agreement for the facility. *Id.*

In October 1993, Legacy filed for an Order of Mandate in the Delaware County court to force FSSA to fulfill its administrative function and issue a provider agreement. *Id.* On October 13, 1993, the Delaware County court ordered FSSA to sign the provider agreement and the agency complied. *Id.* New Horizon was retroactively certified to February 12, 1993. *Id.*

### 3. *Litigation Over Change of Ownership & December 1993 Rate System Change*

In addition to the administrative and legal struggles to certify New Horizon as an ICF/MR, Legacy and the State agencies also litigated over whether FSSA needed to recognize Legacy as the owner of CCC facilities when Bradburn acquired all of his parents' business assets in October 1993. *Id.* ¶ 55. Bradburn contends that the change in ownership caused confusion at FSSA. *Id.*

Legacy filed a lawsuit in Delaware Superior Court to force FSSA to recognize Legacy as a new provider; the parties reached a joint stipulation in the suit on January 8, 1994. *Id.* & Pl.'s Exh. 2, Joint Stipulation, *Community Care Ctrs. v. Ind. Family & Social Servs.*, Cause No. 18D02–9307–CP–121 (Jan. 8, 1994). By stipulation, FSSA was required to enter into

provider agreements with Legacy. Bradburn Decl. ¶ 55. Bradburn declares that Davis was involved in this proceeding and appeared visibly angered by the outcome. *Id.*

Also, on December 1, 1993, FSSA published a new rate system. *Id.* ¶ 57. The two systems that affected Legacy were Rule 12, for ICF/MRs, and Rule 14, for NFs. *Id.* Bradburn perceived that the main thrust of the new rules was to punish changes in ownership of long term care facilities; the more recent the change in ownership, the more devastating the impact on the business. *Id.* There was no adjustment period built into these rules as there had been for every major rule change that Bradburn could recollect. *Id.*

The new rules shifted funds between providers. *Id.* Some facilities received increases, however, Legacy lost money, in part, because of the lack of an adjustment period. *Id.* Bradburn perceived that "the new rules were designed to drive [Legacy] out of business." *Id.*

Bradburn states that because the impact of the new rules on Legacy was so great, it was forced to litigate. *Id.* ¶ 58. Legacy and the FSSA settled the cases that arose from this situation; in the settlement, Legacy agreed to pay approximately $300,000.00 per month for eight months in offsets, starting in June 1996. *Id.* ¶ 61.

### D. MEETING BETWEEN FSSA & ISDH REGARDING LEGACY

Through discovery associated with administrative proceedings initiated by ISDH against Legacy in late 1996, Legacy discovered that FSSA and ISDH had an informal meeting on November 6, 1996. *Id.* ¶¶ 67–70; Pl.'s Exh. 18, at 23–33. However, initially, when Legacy inquired through interrogatories to ISDH about any contact between FSSA and ISDH regarding North Vernon, Coleman, who

signed the interrogatory answers on behalf of ISDH, answered, "Not to our knowledge." Pl.'s Exh. 4. But, during her deposition regarding the issue at the time of the administrative proceedings, Hornstein acknowledged that the answer was incorrect because there was an "informal meeting" that she had forgotten about. Pl.'s Exh. 5, at 36.

Hornstein testified that the meeting was about Legacy facilities and that she could not recall such meetings taking place very often. Pl.'s Exh. 18, at 32. According to Hornstein, in addition to herself, the following people attended the meeting: Mason, Karen Filler, from OMPP, Davis, Beverly Craig ("Craig"), and Coleman. *Id.* at 23–29; Pl.'s Exh. 172, at 10. According to Craig, Susie Scott was also there. Pl.'s Exh. 172, at 10.

During an agency hearing on November 25, 1996, Craig testified about the meeting. *Id.* Specifically, Craig testified:

Q There was a representative from the Attorney General's Office, do you recall?

A Yes.

Q Why would that person be there?

A Again, whenever a facility is giving poor care in this state, we want to involve as many people that may be involved in a licensure action.

Q How would they—how could they get involved in a licensure action, I mean knowing that it's a proceeding before the administrative law judge at least initially?

A If action is taken and your license is revoked and you continue to operate as an unlicensed facility.

Q They could get into enforcement.

A Yes.

Q Representing the agency.

A Right.

*Id.* at 9–10. With respect to the purpose of the meeting, Craig testified as follows:

Q . . . now, the question is is [sic] this related to your reasons for convening this meeting, the fact that it's a corporation with multiple facilities having multiple problems?

A What's related to me having these meetings is how residents are going to be cared for. That's the bottom line, whether they are being cared for and whether there are systems in place to correct the problems that have been identified with specific issues.

Q Right. Now, OMPP doesn't care for any residents or even have anything to do with caring for residents, do they?

A But certainly they make financial provisions to have residents cared for.

Q They are responsible, aren't they, for paying for the Medicaid side of it?

A Right.

Q Which is a big part of it.

A (Affirmative nod). [sic]

Q Is that why you had them to the meeting?

A Well, if facilities are gonna take tax money to care for residents, then we have a duty to make sure that that money also is actually being spent to care for those residents.

Q Right. But I'm still—you are not connecting me as to why the people who make the reimbursement payments are invited to a meeting where the real concern is the care of the residents since they don't really affect that one way or the other. I don't understand that—

A It affects it from the standpoint that the facility is taking money from

that agency to care for that—for those residents.

Q Right. As is any facility that's in the Medicaid program; right?

A That's correct.

Q But that—so you invited them there because the facility gets Medicaid money; is that what you are saying?

A They are the fiscal intermediary to pay for those Medicaid residents.

Q But were you there to see whether the reimbursement was adequate to care for them? I mean what's the reason for bringing them in on a care issue basically?

A I just explained that.

Q Because they pay for it.

A Because they pay for it. If you pay the bills in your house, you would want to make sure that your house—the bills that you are being paid for [sic], that services are received for the bills that you are being paid for; right?

Q So are you saying that you brought them in because you wanted them to see what results their money was producing?

\* \* \*

Q Is that what you are saying?

\* \* \*

Q Well, part of the bill's paid by Medicare; right?

A That's correct.

Q So did you invite them to the meeting?

A We notified HCFA and I'm sure HCFA notifies them.

Q But I mean did you invite them to the meeting on November the 6th, Medicare representatives?

A No, I did not.

Q Some of the bills are paid by private payors; right?

A Would you want us to reconvene another meeting and have the private payors and Medicare?

Q I'm just getting to your rationale for the meeting. You said the person who pays the bills ought to be there. I think—in essence I think that's what you said.

A No, you asked me why did I invite Medicaid and I explained why I invited them.

Q Because they pay the bills for the Medicaid program. A Uh-huh. And they are a State agency.

*Id.* at 19–22. Craig also testified:

Q You would not begin a licensure action, file one of these complaints unless there was some problem that you believe to be there with the care of the residents.

A Obviously not.

Q Right. And so how did you decide that this particular action warranted a meeting of this type where others may not have?

A I just explained that.

Q You told me you are concerned with the care of the residents.

A We had two facilities that were given—giving terrible care at facilities owned by the same corporation at the very same time.

Q And what is the significance of that?

\* \* \*

Q I'm asking her the next question. What is the significance of it? I'm asking you for your reasoning process.

A The significance is to see how many facilities a corporation can own and

give poor care in this state at the same time.

Q To see how many they can own and give—

A Or to make a determination about the care being given through a corporation to two facilities independent of each other at the same time, that both facilities were giving poor care in this state.

Q Owned by the same corporation.

A Owned by the same corporation at the same time.

Q And that's the reason for having this meeting? A That's correct. Or one of—that's part of it.

Q A reason.

A Yes.

Q And what did you expect to accomplish in that meeting about that subject, the sheer fact that one corporation owned two facilities having a problem?

A Because it's not—it's—I don't understand what you mean.

Q Well, is it your policy—you know, there are corporations that own 50 facilities. There are people in the ICF/MR field who own strings of group homes. There are—it is not unheard of for a corporation to have two facilities battling such issues at the same time, is it?

A You asked for my reasoning. I gave it to you.

Q Yeah. Is this corporation different from those other corporations?

\* \* \*

Q Beverly. You ever do this with Beverly?

MR. COLEMAN: Do what?

Q Have a meeting like this.

A To my knowledge Beverly has not come under the same set of facts.

Q Meaning two facilities at the same time?

A (Affirmative nod), with poor care, such poor care that we are this concerned about the residents.

Q Now, what did you expect the representatives of FSSA to contribute to that particular part of the problem when you called them in or did you just—

A It was informational sharing of information. [sic]

Q Right. And what information did you anticipate getting from them?

A Whatever they had to share.

Q But what?

A I can't tell you what. I don't have any idea what they would—what knowledge that they would have that we would not have that would shed light on how your client would better be able to take care of the residents. I don't have knowledge of that.

Q Well, we know what they do. You know their function. They operate the Medicaid reimbursement system.

A We have said that.

Q Correct. And you know that they have nothing to do with setting standard of care or surveying, the decertifying, delicensing, they have nothing to do with that, do they?

A I don't believe they do.

Q So the only information they could give you would have to do with the reimbursement system; right?

[Objection by MR. COLEMAN]

Q What information would you expect to get from them?

A Whatever information they had to give that would shed light on why your client is giving poor care in this

state. I have no idea what information that would be.

*Id.* at 27–31.

With respect to the purpose for this meeting, Davis, during her deposition on May 31, 2006, testified as follows:

A. I do not have a specific recollection of the purpose of the meeting. I seem to think that it had to do with the concern that if some of the nursing homes were to have to close because funding wasn't adequate or whatever, whatever, [sic] they couldn't care for patients any more, I believe some of the discussion points had to do with planning for that eventuality because it seems to me that one of the reasons we had to come together to discuss that was because that didn't happen in Indiana very much so it wasn't as if the State Health Department was, you know, constantly moving patients from closed nursing facilities. So it seemed to me that we were trying to coordinate to make sure that we had adequate plans in place to perhaps move patients if a nursing facility couldn't continue to operate.

Pl.'s Exh. 3, at 18–19.

### E. THE NORTH VERNON LICENSURE MATTER

#### 1. *North Vernon Never Receives Physical Copy of its License*

At the end of the administrative proceedings described, in part, above, the North Vernon facility was decertified as of October 24, 1996. *Id.* ¶¶ 100, 103. At the time of the decertification, Hornstein was Division Director of Long Term Care at ISDH. *Id.;* Hornstein Decl. ¶ 5.

Not satisfied with this result, Legacy appealed the decertification to a federal court. Bradburn Decl. ¶¶ 100, 103. In addition, Legacy also obtained a recertifi-

cation application. *Id.* ¶ 103. Citing letters signed by Hornstein, Bradburn contends that Hornstein controlled, in large part, the process for recertification. *Id.* ¶¶ 103 –06; Pl.'s Exh. 14, Attach. B; Pl.'s Exh. 14, Attach. C; Pl.'s Exh. 14, Attach. D. This recertification process continued through April 2, 1997, when the parties reached a settlement of the litigation in federal court. Bradburn Decl. ¶ 107.

Apparently during one of the administrative hearing phases of this process, Richard Nover ("Nover"), ISDH's attorney at the time, questioned Bradburn about Legacy's purchase of a plane. *Id.* ¶ 88; Pl.'s Exh. 8, at 188. Nover quickly changed tact when he learned that the purchase of a plane had nothing to do with the issues at hand. *Id.* Bradburn alleges that the only way that Nover could have known to ask about the plane in the manner he did was through Davis and the November 6, 1996, meeting between ISDH and FSSA personnel. Bradburn Decl. ¶ 89.

Just prior to the meeting between FSSA and ISDH, in mid to late 1996, ISDH initiated proceedings against Legacy's North Vernon facility for license revocation and decertification. *Id.* ¶ 67. At the end of the administrative proceedings, the North Vernon facility was decertified as of October 24, 1996. *Id.* ¶¶ 100, 103. At the time of the decertification, Hornstein was Division Director of Long Term Care at ISDH. *Id.;* Hornstein Decl. ¶ 5.

Not satisfied with this result, Legacy appealed the decertification to a federal court. Bradburn Decl. ¶¶ 100, 103. In addition, Legacy also obtained a recertification application. *Id.* ¶ 103. Citing letters signed by Hornstein, Bradburn contends that Hornstein controlled, in large part, the process for recertification. *Id.* ¶¶ 103 –06; Pl.'s Exh. 14, Attach. B; Pl.'s Exh. 14, Attach. C; Pl.'s Exh. 14, Attach.

D. This recertification process continued through April 2, 1997, when the parties reached a settlement of the litigation in federal court. Bradburn Decl. ¶ 107.

Apparently during one of the administrative hearing phases of this process, Richard Nover ("Nover"), ISDH's attorney at the time, questioned Bradburn about Legacy's purchase of a plane. *Id.* ¶ 88; Pl.'s Exh. 8, at 188. Nover quickly changed tact when he learned that the purchase of a plane had nothing to do with the issues at hand. *Id.* Bradburn alleges that the only way that Nover could have known to ask about the plane in the manner he did was through Davis and the November 6, 1996, meeting between ISDH and FSSA personnel. Bradburn Decl. ¶ 89.

Recertification of North Vernon commenced after the settlement of litigation in April 1997. *Id.* ¶¶ 103, 107. Throughout this period, Legacy told its Medicaid residents that they could stay at the North Vernon facility and that Legacy would absorb the costs. *Id.* ¶ 101.

On May 2, 1997, ISDH conducted an initial certification survey and indicated that the North Vernon facility was in substantial compliance. *Id.* ¶ 108; Pl.'s Exh. 14, Attach. H. The agency indicated to Legacy that the facility had to pass another survey within sixty days. Bradburn Decl. ¶ 108. ISDH conducted the second survey on July 7, 1997, and found the facility in substantial compliance. *Id.* ¶ 110. The survey report indicated to Legacy that the facility would be readmitted for participation in the Medicaid program effective July 7, 1997. *Id.;* Pl.'s Exh. 14, Attach. K. Based on its understanding that its license had not been revoked, but it needed only to get certified to be eligible for the Medicaid program, Legacy presumed that this notice indicated that the North Vernon facility was also licensed. Bradburn Decl. ¶ 111. However,

Legacy never received a copy of its license. *Id.* ¶ 106.

Bradburn claims that ISDH would not let Legacy apply for Medicaid and Medicare certification of the North Vernon facility at the same time; therefore, after it received Medicaid certification, Legacy applied for Medicare certification for the facility. *Id.* ¶ 112; Pl.'s Exh. 14, Attach. M. Legacy submitted its Medicare certification application on August 8, 1997. Bradburn Decl. ¶ 114. However, on August 21, 1997, Richard Buchanan, Program Director–Provider Services, Division of Long Term Care, ISDH, sent Legacy a letter explaining that some of the documents the agency had given Legacy were outdated and Legacy needed to resubmit the application. *Id.* ¶ 115; Pl.'s Exh. 14, Attach. O. Legacy resubmitted the application on September 10, 1997. Bradburn Decl. ¶ 115; Pl.'s Exh. 14, Attach. P.

After ISDH reviewed the application, it sent the application to the Administar Federal ("Administar"), the Medicare fiscal intermediary. Bradburn Decl. ¶ 116. Legacy received a response from the Administar on October 16, 1997, indicating that Legacy needed to resubmit the entire application, and must provide a copy of its license. *Id.;* Pl.'s Exh. 14, Attach. Q.

Despite numerous calls to ISDH, Legacy was unable to obtain a copy of its license. Bradburn Decl. ¶¶ 117–18. Legacy resubmitted its Medicare certification application on December 1, 1997, without a copy of its license. *Id.* ¶ 118. On January 7, 1998, Administar issued Legacy another letter to Legacy asking for another complete resubmission, and a copy of the North Vernon license. *Id.* ¶ 119.

On March 17, 1998, Legacy received its annual "Application for Renewal of Health Facility License," which it filled out and submitted to ISDH. *Id.* ¶ 120; Pl.'s Exh. 14, Attach. U. ISDH processed the appli-

cation, however, Legacy did not receive a copy of its license. Bradburn Decl. ¶ 120.

On March 24, 1999, Legacy received the annual "Application for Renewal of Health Facility License." *Id.* ¶ 134. Again, Legacy completed the application and sent it to ISDH. *Id.;* Pl.'s Exh. 14, Attach. W. Legacy did not receive the license. Bradburn Decl. ¶ 134.

Because Legacy never received the license for North Vernon, the facility was never certified for Medicare. *Id.* ¶ 135.

During the period between 1996 through 1999, Bradburn and Legacy employee Debra Springer ("Springer") reviewed Legacy's public files at ISDH. *Id.* ¶ 136. In the fall of 1999, they reviewed the files specifically looking for a copy of the North Vernon license or "Notice of Order Granting a License." *Id.* There was nothing in the public files concerning a license at that time. *Id.* However, during discovery in the instant case, on April 15, 2004, Defendants submitted supplemental answers to Legacy's document request. *Id.* ¶ 137. As part of that disclosure, three licenses for the period between June 1, 1997, and May 31, 2000, that were stamped "VOID," were obtained. *Id.;* Pl.'s Exh. 16.

When Bradburn reviewed Legacy's public files again in 2005, in the file for 1998, Bradburn discovered the normal license renewal documents, including a clean, executed copy of the license. *Id.* ¶ 138; Pl.'s Exh. 17.

When asked about the licenses during her deposition, Hornstein stated that she assumed the licenses were given to Legacy. Pl.'s Exh. 18, at 51–52. In addition, when asked about the procedure for licensures, Hornstein testified that she uses "the law," found at Indiana Code § 16–28. *Id.* at 105–06.

## 2. *State Action Regarding North Vernon's License*

According to Defendants, with respect to North Vernon's license, on June 5, 1998, ISDH conducted an annual recertification and licensure survey at North Vernon. Defs.' Exh. 10, N. Vernon Facility Survey History, at 7. Surveyors found fifteen deficiencies, three of them were at the "harm" level. *Id.*

As required, ISDH conducted a post-certification revisit on August 6, 1998. *Id.* at 6. Nine deficiencies were found. *Id.* ISDH conducted a second follow-up survey on September 24, 1998. *Id.* Six deficiencies were found. *Id.* at 5. At the third follow-up survey, performed on November 13, 1998, ISDH found three deficiencies. *Id.* On December 4, 1998, ISDH performed a fourth follow-up survey at which seven deficiencies were found. *Id.*

At that point, because North Vernon had been found to be out of compliance with federal regulations for 180 days, federal law required that North Vernon's Medicaid certification be terminated. Hornstein Decl. ¶ 29; 42 CFR § 488.412(a); Defs.' Exh. 10, generally.

North Vernon appealed this decertification action and a stay was granted; the appeal was ultimately dismissed by stipulation of the parties. Defs.' Exh. 11.

On March 24, 1999, ISDH issued North Vernon an Emergency Order for Placement of a Monitor and Ban on Admissions, under Cause No. AEO–21–99. Defs.' Exh. 12. This Order was based on a complaint survey completed at North Vernon on or about March 22, 1999, that resulted in a finding of immediate jeopardy. *Id.* In addition to this action, ISDH also filed an action that sought to revoke North Vernon's license and issued an order regarding North Vernon's Medicaid certification, under Cause Nos. C–580–99 (license), C–

590–99 (license), and M–167–99 (Medicaid). Defs.' Exhs. 13, 14, 15.

On April 27, 1999, the ALJ entered a recommended order in Cause Nos. AEO–21–99, C–580–99, and M–167–99. Defs.' Exh. 13. Based on the ALJ's findings of fact, the ALJ concluded that North Vernon had failed to prevent a resident's dehydration and sever weight loss, to notify the resident's doctors of the severity of the weight loss, to monitor adequately the effect of lasix on the resident's hydration and nutritional status, to prevent the resident's developing a pressure sore or providing pressure relieving devices for the pressure sore, to groom the resident and to secure two drawers in a medicine cart. *Id.* The ALJ entered a recommended order that affirmed ISDH's decision to place a monitor at the facility and to impose a thirty-day ban on admissions. *Id.* On April 29, 1999, the ALJ in the same causes issued an Omitted Conclusion of Law adding the statement that "Conclusions of Law 1 through 5 constitute immediate jeopardy as that term is defined in the Indiana State Department of Health State Operations Manual." *Id.*

In the Medicaid decertification case, M–167–99, on June 14, 1999, the ALJ granted Legacy's motion to stay ISDH action until Findings of Fact, Conclusions of Law, and a Recommendation were issued. Defs.' Exh. 14. The Order set the matter for a hearing on the merits on July 19, 20, and 21. *Id.*

On August 20, 1999, the ALJ issued a Recommended Order in Cause Nos. AEO–21–99, C580–99, M–167–99, indicating that the ALJ had conducted a hearing on April 1, 8, 12, and 20, 1999, on the Emergency Order for Placement of a Monitor, after which she upheld that Order and found immediate jeopardy at North Vernon. *Id.* In addition, the August 20, 1999, Order indicated that a stay was issued on the Medicaid issue pending the outcome of a

hearing to determine whether Legacy had abated the immediate jeopardy at the facility. *Id.* Furthermore, the August 20, 1999, Order included the following findings of fact:

> 29. Petitioner [Legacy] argues that the Division [ISDH] subjected Petitioner to unfair and disparate treatment as compared to other facilities surveyed in recent months.
>
> 30. The Administrative Law Judge does not find that the Division treated Petitioner unfairly or disparately.

*Id.*

The August 20, 1999, Order concluded that "[t]he particular deficiencies which triggered the immediate jeopardy finding at the jeopardy survey, dehydration and weight loss, were not repeated at the level of immediate jeopardy in the abatement survey." *Id.*, Concl. of Law No. 5. The Order also concluded that North Vernon's Medicaid certification should not be terminated at that time, but ordered ISDH to conduct another certification survey 180–days after the date of the abatement survey. *Id.*

On September 13, 1999, the ISDH Appeals Panel entered a Final Order in Cause No. APAEO–21–99, that adopted the ALJ's Findings of Fact and Conclusions of Law from the April 27, 1999, Recommended Order. Defs.' Exh. 17. The Appeals Panel ordered the immediate placement of a monitor at North Vernon and a thirty-day ban on admissions. *Id.*

Legacy appealed the Appeals Panel Order to the Marion Superior Court, Cause No. 49D04–0001–MI–99. Defs.' Exh. 18. The cause is still pending. *Id.*

On September 22, 1999, ISDH filed an Administrative Emergency Order for Placement of a Monitor and Ban on Admissions. Defs.' Exh. 19.

On September 30, 1999, ISDH filed a Verified Petition for Emergency Civil Enforcement in the Marion Superior Court, Cause No. 49D12–9909–CP–1381. Defs.' Exh. 20. On October 13, 1999, the Marion Superior Court entered an Emergency Order for Civil Enforcement and Order Setting Preliminary Injunction Hearing for October 22, 1999. Defs.' Exh. 21.

On October 15, 1999, ISDH issued a Notice of Termination of Placement of Monitor and Ban on New Admissions. Defs.' Exh. 22. This Notice indicated that as the result of a walk-through survey of North Vernon on October 14, 1999, ISDH decided "the conditions that existed during the survey have been addressed by the facility and the placement of a monitor and ban on new admissions as a result of the September 20, 1999[,] survey is hereby terminated." *Id.*

On October 20, 1999, ISDH filed a motion to dismiss the civil enforcement action in Marion Superior Court; Legacy sought sanctions contending that Hornstein had misled the court. Defs.' Exh. 20. By Order dated March 10, 2000, the judge granted the motion to dismiss and denied Legacy's motion for sanctions. *Id.* Legacy did not appeal that Order. Hornstein Decl. ¶ 30.

With respect to the license, ISDH Cause Nos. C–580–99 and C–590–99 were a consolidation of the two ISDH actions against North Vernon's license. Defs.' Exh. 23. At an administrative hearing on September 27, 1999, in Cause Nos. C–580–99, M–167–99, AEO–21–99, and C–590–99, Hornstein testified that ISDH had found "immediate jeopardy deficiencies [at North Vernon] three times in 1999 indicating that [the] facility cannot maintain compliance, therefore, has harmed residents in the past, and I cannot guarantee that they will not harm residents in the future." Defs.' Exh. 16, at 151–52.

At the same hearing, Hornstein testified as follows:

Q. But you wanted to do it with a new proceeding rather than finishing the old proceeding?

A. I wanted to do whatever I can to get this license revoked as this facility cannot maintain compliance and cannot take care of its residents.

Q. How long have you felt that way?

A. Probably since the beginning of '99 or whenever that survey was that showed immediate jeopardy.

Q. So whatever went on in '98 it wasn't sufficient to provoke you to want to revoke the facility's license?

A. Correct.

* * *

Q. So why did you open another licensure action in April when the March licensure action was pending?

A. To assure that this license was revoked.

Q. Well, how would that more assure that you'd get it revoked?

A. Anything that I can do to get that license revoked needs to be done.

Q. Well, and tell me again why you were so dead set on doing anything you can to get this license revoked?

A. This facility cannot take care of its residents, it has harmed residents continuously for 1996[sic], and immediate jeopardy level in '96, actual harm level '97, actual harm level '98, immediate jeopardy level times three in '99.

Pl.'s Exh. 118, at 162–64.

Later in the hearing on the same matter, Reynolds testified that she and the licensure enforcement team, comprised of herself, Lataisha Horton, Becky Lair, Darlene Jones and Debbie Beers, for situa-

tions in which immediate jeopardy is an issue, would apply handwritten criteria to determine whether or not to recommend to Hornstein to proceed with a licensure action against a facility. Pl.'s Exh. 119, at 67–80. Reynolds stated that she received the handwritten criteria from Hornstein sometime in 1998. *Id.* at 67–68; 71, 73, 77. The enforcement team only applies the criteria to survey reports that indicate immediate jeopardy or substandard quality of care issues. *Id.* at 71. The handwritten sheet reads:

LICENSURE ACTION CRITERIA

Discussions of Licensure Actions would take place when the following are found on a survey: (proposed)

1.> Immediate Jeopardy

2.> Condition level PCR's (ICF/MR)

3.> SSQC at PSR (SNF/NF)

4.> Any findings at [G or higher] 2nd revisit

5.> Repeat offense, (within past 2 calendar yrs.[) ]

6.> SSQC at first survey with hx [sic] of SSQC/Poor perform.

7. 180 NON COMPLIANCE AT G OR ↑

The two types of licensure action:

—probationary license w/ mandatory consultant or monitor

—revoke license

Licensure actions are taken because the facility has a systemic breakdown where harm, or the potential to harm, exists. This systemic problem could affect the entire universe, it is not a one-time instance/occurrence. A licensure can occur at an annual survey, given the above parameters.

Pl.'s Exh. 120 (some alteration in original).

Bradburn asserts that based on his review of ISDH records and the criteria listed in Hornstein's list, the following facilities should have been recommended to Hornstein for licensure actions in the

1998–1999 time frame: Bloomington Convalescent; Bethlehem Woods; Riley Healthcare; Westminster, Clarksville; Englewood; Sheffield Mannor; Lynhurst Healthcare. Bradburn Decl. ¶ 610; Pl.'s Exh. 121. Reynolds testified that she can only recall licensure actions being recommended for Legacy's North Vernon facility and one other facility, New Day, during that time frame. Pl.'s Exh. 120, at 65–67.

As part of the survey at North Vernon that Ellis conducted on September 20, 1999, she alleged that immediate jeopardy existed because one resident was a danger to others. Bradburn Decl. ¶ 612. While Ellis was in the facility, the resident had a psychological evaluation performed. *Id.* ¶ 613. The psychologist who performed the evaluation determined that the resident was not a threat to himself or others. *Id.* Ellis spoke with the psychologist who performed the evaluation and made a notation of the psychologist's findings in her notes. *Id.* Bradburn alleges that despite this knowledge, Ellis found immediate jeopardy based on this resident after she received a communication from ISDH's legal department. *Id.*

During that survey Ellis recalls that she received a document of some type from ISDH's legal department that was not out of the State Operations Manual, "but it was something that gave guidance during surveys. I don't know what—I don't know where, what it was from, but there was a copy of something that they had marked something in there for me for instructions." Pl.'s Exh. 35, at 26–32.

In contrast, Bradburn contends that his review of ISDH's records indicate that at another non-Legacy facility surveyed by Ellis when she was faced with a resident with a history of violent behavior toward other residents Ellis alleged that the scope and severity of that facility's patient was an "H," which is actual harm, but not

immediate jeopardy. Bradburn Decl. ¶¶ 615–16.

After the hearing in September and October 1999, the ALJ entered Findings of Fact, Conclusions of Law, and Recommended Order on January 11, 2000. *Id.* The ALJ recommended that North Vernon's license be revoked. *Id.* In addition, as part of her ruling, the ALJ stated:

North Vernon argues that the Department did not follow its internal policy regarding what criteria must be met before a license revocation proceeding may be initiated. The evidence shows that the Department followed its internal policy in initiating the second and third license revocation actions in March and April 1999.

*Id.*

In the Medicaid decertification action, M–167–99, on February 14, 2000, the ALJ entered Findings of Fact, Conclusions of Law, and Recommended Order. Defs.' Exh. 24. The ALJ recommended: "North Vernon should be decertified as a Medicaid Provider effective the date this Recommended Order becomes effective." *Id.*

Legacy appealed all of the above-referenced rulings and in Cause Nos. AP–M–167–99, AP–C580–99, and AP–C–590–99 the Appeals Panel entered a Final Order on August 7, 2000. Defs.' Exh. 25. The Appeals Panel reversed the ALJ's decision regarding North Vernon's decertification, and revised the August 20, 1999, Order that North Vernon's Medicaid certification not be terminated. *Id.* Specifically, the Appeals Panel stated:

The Conclusion of Law # 7: The Conclusion of Law was contrary to the evidence and beyond the scope of the ALJ's authority as stated in # 5 above. Therefore, the Conclusion was amended to read as follows: "The particular deficiencies which triggered the immediate jeopardy finding at the jeopardy survey, i.e., dehydration and weight loss, were

not repeated at the same level at the time of the abatement survey, the combination of the deficiencies concerning untreated, uncovered decubitous ulcers, UTIs, weight loss, problems with incontinence care, a number of NAR residents, lack of follow-up on nutrition recommendations and hydration for NAR residents, and the fact that the MDS's [minimum date sets], were not current on some residents constitutes immediate jeopardy and the evidence shows that jeopardy was not abated at the time of the abatement survey."

\* \* \*

### *AUGUST 20, 1999 RECOMMENDED ORDER*

Since it was determined above that immediate jeopardy still existed at the time of the abatement survey, the ALJ had no authority to order continuation of payment for 180–days pursuant to 42 CFR 488.450. While both parties admit that the procedure for appeal of Medicaid decertification is still a matter of debate, it was clear to the panel that the facility did not meet the requirements set out in the Federal regulation for continued payment. Thus, the Order was amended to read as follows: "That the relief request in Cause No. M–167–99 be denied and the Petitioner's Medicaid certification is terminated due to the existence of immediate jeopardy that was not abated during the allotted statutory time for abatement of the jeopardy."

*Id.* at 3.

In addition, the Appeals Panel amended and renumbered the ALJ's Finding of Fact from August 20, 1999, and included the following findings:

22. Petitioner argues that the Division subjected Petitioner to unfair and dispa-

rate treatment as compared to other facilities surveyed in recent months.

23. The Administrative Law Judge does not find that the Division treated Petitioner unfairly or disparately.

*Id.* at 5. Other relevant Findings of Fact are found at pages 10–13 of the Appeals Panel Final Order. *Id.* at 10–13.

The Appeals Panel Final Order contained the following relevant Conclusions of Law:

12. North Vernon has a history of non-compliance dating back to 1996 as [documented] in Findings of Fact 5, 12, 14, 16, 17, 19, 22, and 29–36 and in Findings of Fact dated April 27, 1999[,] and August 20, 1999[,] which are incorporated herein by reference.

13. [Indiana Code § ]16–28–3–1(a)(3) states:

The director may initiate a proceeding to issue a probationary license or to revoke a license issued under this article on any of the following grounds:

\* \* \*

(3) Conduct or practice found by the director to be detrimental to the welfare of the patients at the health facility. . . .

14. The Department did not abuse its authority in initiating and pursuing these proceedings to revoke North Vernon's license.

15. North Vernon moved to dismiss this case on the basis that the criteria for the initiation of a license revocation action were not discernable at the time this action was begun; therefore, the Department's decision to take the action was arbitrary and capricious.

16. North Vernon's Motion to Dismiss these actions should be denied on both of the grounds it asserts.

17. North Vernon cites the compliance history of several other long-term care facilities and the resulting action by the Department for the proposition that it was treated disparately in terms of enforcement actions taken against it.

18. The analysis required to determine whether North Vernon has been treated disparately in terms of enforcement actions is complex and multi-faceted. It cannot be undertaken by simply comparing numbers and types of survey findings.

19. There is insufficient evidence to show that North Vernon has been treated disparately in terms of enforcement actions taken against it as compared to other long-term care facilities.

*Id.* at 14–15.

The Appeals Panel Final Order provided that "North Vernon's license should be revoked and a State-appointed monitor should be placed in the facility to protect the residents and to assist in the relocation of residents to other appropriate placements." *Id.* at 15.

Legacy did not appeal the decision of the Appeals Panel. Hilliard Decl. ¶¶ 6a–6c.

### 3. *Meeting Between Legacy, ISDH and HCFA*

In the midst of the North Vernon licensure matter, on July 23, 1998, Robert E. Spain ("Spain"), then Program Representative, Department of Health & Human Services, Region V, scheduled a meeting between HCFA, ISDH and Legacy to resolve outstanding issues between the agencies and Legacy. Bradburn Decl. ¶¶ 121–22. Spain and Barbara Markovich ("Markovich"), who was a Regional Office Evaluator ("RO"), would attend on behalf of HCFA, Hornstein, Coleman, Reynolds and Mason were to attend on behalf of ISDH. *Id.* ¶ 121. Prior to the meeting Legacy made a list of the issues it wanted addressed that included: North Vernon's Medicare certification; clarification of the

process for disputed findings; time lapse between exit and receipt of survey report; scope of follow up surveys; attitude of surveyors and attacks on employees and residents; apparent conflicts of interest in surveyors who were also witnesses; threats against vendors, administrators and staff at Legacy facilities; pyramiding findings; cycles; procedure for ordering State Operations Manual; and procedure for ordering HCFA/ISDH forms. *Id.* ¶ 122.

Bradburn recalls that Spain started the meeting with comments regarding the purpose of the gathering. *Id.* ¶ 123. Bradburn observed Hornstein, Coleman and Reynolds looking around, whispering back and forth, and apparently ignoring Spain. *Id.* ¶ 124.

Bradburn recalls that he then spoke about trying to clarify what it needed to do to satisfy ISDH. *Id.*

Spain asked ISDH to comment on Bradburn's statement. *Id.* ¶ 125. Bradburn recalls that Hornstein made a comment about how Legacy needed to expend its energies on compliance rather than disputing ISDH's findings. *Id.* At that point, Bradburn suggested that they address each of the issues Legacy had prepared to discuss and resolve them, which is what occurred. *Id.*

As the meeting progressed, Bradburn observed that Spain's voice got louder, that Spain moved forward in his chair and that Spain began to take notes. *Id.* ¶ 126.

With respect to the North Vernon Medicare certification issue, Legacy told Spain that the only thing that they lacked was a copy of the license. *Id.* ¶ 127. Spain asked ISDH if the facility was certified to which Hornstein said yes. *Id.* Hornstein also assured Spain that the facility was licensed. *Id.* Spain then asked why Legacy did not have the license. *Id.* According to Bradburn, the ISDH people blamed each other until Spain asked what hap-

pened. *Id.* After the ISDH people huddled, Hornstein stated that the license was not issued because it was in litigation, apparently referring to the litigation that ended in settlement in April 1997. *Id.*

On August 27, 1998, Legacy sent Spain a letter to address the "litigation" issue raised by Hornstein in the July meeting. Bradburn Decl. ¶ 132.

In addition to the licensure matters, issues related to the conduct of survey teams at Legacy facilities were also discussed at the July 1998 meeting. *Id.* ¶¶ 239–40. Bradburn recalls that Spain and Markovich agreed that if Legacy's accounts were true, the surveyors were not conducting themselves in accordance with proper procedure. *Id.* ¶ 239. Hornstein apparently offered to communicate with her Survey Manager, Diane Zalinski ("Zalinski"), and stated that if the surveyors were out of line, Zalinski would address the problem. *Id.*

Because of the conduct of a survey team that was occurring at Legacy's New Castle facility in August 1998, the details of which are described below, by letter dated August 20, 1998, Legacy communicated its concerns about surveyor behavior to Zalinski. *Id.* ¶ 240; Pl.'s Exh. 50. In addition to the letter, Legacy included statements from staff members. Pl.'s Exh. 50. Legacy never received a response to its complaints. Bradburn Decl. ¶ 240.

Apparently, shortly after the meeting with Spain and ISDH, Legacy learned that Spain was no longer on the Legacy case. *Id.* ¶ 133. Hornstein told Bradburn that Spain had moved to another HCFA Regional Office, and that a new Program Representative, Douglas Wolfe ("Wolfe"), was handling Legacy's cases. *Id.* However, Bradburn later learned that Spain was not reassigned to a different office. *Id.* ¶ 131.

### F. OTHER LEGACY FACILITY LICENSURE MATTERS

On February 7, 1997, the ISDH initiated a licensure action against Legacy's Seymour facility, Cause No. C–542–97. Bradburn Decl. ¶ 141. The action was dismissed on August 25, 2000. *Id.* ISDH issued and gave a copy of the license to the facility while the action was pending. *Id.;* Pl.'s Exh. 20.

On March 3, 1999, ISDH initiated a licensure action against CCC of Columbus, Cause No. C–578–99. Bradburn Decl. ¶ 143. The action was dismissed on November 2, 1999. *Id.* The ISDH issued, and gave Legacy a copy of, the license during pendency of the action. *Id.;* Pl.'s Exh. 21. A second licensure proceeding pended against that facility during this period, Cause No. C–557–98, that was dismissed on October 22, 1999. Bradburn Decl. ¶ 143. Yet the license still issued. *Id.*

On March 29, 1999, ISDH initiated a licensure action against Portland Community Care Center West, Cause No. C–587–99. *Id.* ¶ 144. The action was dismissed on July 13, 1999. *Id.* ISDH issued a license on June 8, 1999, and gave Legacy a copy of it while the action was pending. *Id.;* Pl.'s Exh. 22.

### G. SURVEY CYCLES

As explained above, it is ISDH's responsibility to conduct surveys at long-term care facilities like NFs and ICF/MRs. 42 CFR § 442.109(a). Apparently, the end of a survey in which a deficiency is found marks the beginning of a 180–day period during which the facility must correct the deficiency or face decertification. Bradburn Decl. ¶ 146; Pl.'s Exh. 23, Hornstein Feb. 18, 1997, Dep. at 34–37. According to Hornstein, the facility must rectify any deficiencies found from any given survey for the cycle triggered by that survey to end. Pl.'s Exh. 23, Hornstein Feb. 18, 1997, Dep. at 37. If, for example, a complaint survey is performed within the 180–day cycle of deficiencies cited from a previous survey, and the facility has corrected the deficiencies from the original survey, the cycle from the original survey ends, unless the complaint survey shows the same deficiencies. *Id.* at 48. If the findings from the complaint survey, or second survey, are the same, the original 180–day cycle continues to run. *Id.* at 48–49.

An October 15, 1996, e-mail exchange between Mary Louis Reynolds ("Reynolds"), an attorney for ISDH, and Mary Wassel ("Wassel"), a Quality Review ("QR") surveyor, about a question Wassel had about cycle breaking at Whispering Pines (not owned by Legacy) also sheds light on ISDH policies. Pl.'s Exh. 24. The exchange, in its entirety reads:

HI EVERYONE, I HAVE A QUESTION FOR YOU ALL.

THE TEAM WENT AND DID A PSR TO THE SURVEY FOR WHISPERING PINES. WE ALL KNOW THE HISTORY AND PROBLEMS WE HAVE HAD WITH THIS FACILITY. THE TEAM AT THE TIME OF DOING THE PSR TO THE SURVEY ALSO DID THE PSR TO THE COMPLAINTS THAT WERE DONE AT THE TIME OF THE SURVEY. THE TEAM CORRECTED ALL THE COMPLAINTS HOWEVER DID NOT CORRECT ALL THE TAGS FROM THE SURVEY. SO CAN THE TEAM PUT THE SAME 2567L THAT THEY WROTE REPEAT FEDERAL TAGS, THAT THE COMPLAINTS DONE AT THE TIME OF THE SURVEY ARE NOW CORRECTED OR DOES THE TEAM NEED TO WRITE A SEPARATE 2567 FOR THIS. [SIC] I THINK THAT A SEPARATE 2567 NEEDS TO BE WRITTEN SO AS TO BREAK THE CYCLE FOR THE PSR TO THE SURVEY AND TO CONCLUDE THE

CYCLE FOR THE PSR TO THE COMPLAINTS. PLEASE LET ME KNOW. THIS REPORT IS READY TO COME IN ONCE I AM SURE OF THE ANSWER.
THANKS, MARY [WASSEL]
>
I checked with Barb Powers to make sure that the surveyors hadn't been told something other than what I will say. We are in agreement on this one. If the AOBs were done at the same time as the recert, there is no advantage to splitting the PSR surveys into two reports. There is only one cycle currently running. It started with the survey completed 8/12 whether that survey was a recert, AOb [sic] or both. The only time that surveys should be split is when the PSR to an AOB and a recert are done together. Then there would be an advantage to closing out the first cycle in order to start a second one with the recert. MLR >

*Id.* A "2567" is a survey report. Bradburn Decl. ¶ 149.

## 1. *Treatment of Other Facilities*

Upon review of the files for other facilities similar to Legacy's,[3] Bradburn declares that the following occurred:

At Whispering Pines, the facility mentioned in the e-mail string above, an 180–day cycle began with an annual and complaint survey ending on June 23, 1994. *Id.* ¶¶ 152–53; Pl.'s Exh. 25. Bradburn summarizes that the survey was 163 pages long, contained sixty-seven tags, of which six were major violations. Bradburn Decl. ¶ 152. The first follow-up survey, called a "post-survey review" or "PSR," was conducted on August 19, 1994, and showed fourteen tags still out of compliance. Bradburn Decl. ¶ 152. However, the second PSR was not conducted until July 28, 1995, well beyond the 180–day cycle started on June 23, 1994; no decertification commenced. *Id.* ¶ 153. The July 28, 1995, PSR had two repeated tags from the first PSR, F221 and F272. *Id.* None–the-less, the July 28, 1995, survey broke the cycle that started on June 23, 1994. *Id.*

At another facility, called Arbors of Fort Wayne ("Arbors"), on October 27, 1995, Arbors had a complaint survey for which all five complaints were substantiated. *Id.* ¶ 154; Pl.'s Exh. 26. The next survey in the cycle occurred on January 2, 1996, which was the first PSR to the October 27, 1995, complaint survey, and an additional complaint survey. Bradburn Decl. ¶ 155; Pl.'s Exh. 27. The January 2, 1996, survey indicated three substandard quality of care tags and substantiated the complaints. *Id.* On January 12, 1996, ISDH initiated an

---

**3.** Legacy makes a general averment in its brief that it made a comprehensive review of ISDH files in preparation of it opposition to the instant motion. Pl.'s Am. Br. in Opp'n to Defs.' Mot for Summ. J. at 11 ("Pl.'s Opp'n"). Bradburn's declaration makes a similar averment with respect to licenses, but only an oblique reference with respect to other information. Bradburn Decl. ¶ 142. Defendants concede in their reply brief that Bradburn reviewed ISDH files to prepare his declaration. Reply in Supp. of Defs.' Mot. for Summ. J. at 17. The fact that Bradburn may have done a review of the files to support his case or for "self-serving" purposes, as stated by Defendants' in their reply, does not make the evidence inadmissible as Defendants' suggest; rather, admissibility turns on whether the self-serving statements are supported by facts in the record. *See Buie v. Quad/Graphics, Inc.*, 366 F.3d 496, 504 (7th Cir.2004) (holding that "a self-serving affidavit supported by facts in the record could defeat summary judgment"). Under this standard, as long as there is support in the record for Bradburn's assertions, he may use them to defeat Defendants' motion for summary judgment. At this time, the Court makes no finding with respect to the sufficiency of this evidence to establish a material question of fact on any issue.

action to revoke Arbor's license. Bradburn Decl. ¶ 156.

On January 18, 1996, ISDH conducted another complaint survey at Arbors. Pl.'s Exh. 28. This survey substantiated the complaints therein, which were the same problems from the last two surveys, and had two substandard quality of care tags. Bradburn Decl. ¶ 157; Pl.'s Exh. 28. ISDH went back to Arbors and completed a survey on February 21, 1996, that generated two reports. Pl.'s Exhs. 29 & 30. The first report was the third PSR for the October 27, 1995, survey, which stated that the facility was in substantial compliance and broke the 180–day cycle for the October 27, 1995, survey. Pl.'s Exh. 29. The second report was focused on the complaint survey conducted at the same time. Pl.'s Exh. 30. These complaints, similar to the previous complaints, resulted in an F333 tag, out of compliance, which started a new cycle. Id.; Bradburn Decl. ¶ 158.

Also at Arbors, on April 10, 1996, ISDH conducted a complaint survey. Bradburn Decl. ¶ 161; Pl.'s Exh. 31. The survey resulted in substantiation of at least one complaint and an F324 tag, for that quality of care issue. Pl.'s Exh. 31. Specifically, the report indicates that a nursing assistant fractured a resident's ankle; another injury to this resident is also noted. Id. The complaint notes that the family was not notified about the injury in a timely manner and suspected that a staff person had tried to falsify records. Id. This report initiated another 180–day cycle. Bradburn Decl. ¶ 161.

On June 17, 1996, ISDH initiated an annual recertification and complaint survey at Arbors, which transpired on June 17, 18, 19, 20, 21, 23, 24, 25, 26, 27, 28, July 1, 2, 3 and 8. Bradburn Decl. ¶ 162; Pl.'s Exh. 32. While that survey was ongoing,

on June 19, 1996, ISDH's Dianna Jones, also listed as a surveyor on the annual recertification survey, conducted a PSR to the April 10, 1996, complaint survey, and found the facility in substantial compliance, thus breaking the April 10, 1996, 180–day cycle. Id. However, the annual recertification survey, completed July 8, 1996, also alleged substandard quality of care, citing: unlocked medication carts; unlocked supply rooms; unlocked oxygen room; nonfunctional door alarms; failure to ensure adequate fluid intake; failure to provide sufficient staffing; an F322, noting that a resident had a significant weight loss and, due to staff actions, was allowed to aspirate, which resulted in infection and hospitalization. Bradford. Decl. ¶¶ 163–64. ISDH labeled the F322 in the minimal harm category. Id. ¶ 164.

### 2. Treatment of Legacy Facilities

Bradford believes that Hornstein directed Powers, McGee, Ellis, A. Connell and Stark to broaden the scope of PSR surveys at Legacy facilities to extend an ongoing 180–day cycle that would wrongfully keep a facility out of compliance, thus triggering an 180–day cycle decertification process. Id. ¶ 166–68. There is no dispute that Legacy sought intervention from HCFA to defeat each attempt to decertify its facilities. Id. ¶ 168. More specifically, Bradburn cites the following survey evidence:

a. **Portland East, 1996–1997**—On August 29, 1996, at Legacy's Portland East facility, ISDH conducted an annual survey. Id. ¶ 169. Thus, the end of the cycle was set for February 27, 1997. Id. The PSR to the annual was concluded on October 24, 1996, and consisted of three minor tags. Id. Susie Scott ("Scott") [4] was the survey supervisor. Id. ¶ 170.

---

4. Legacy points out that Scott attended the November 6, 1996, meeting between FSSA and ISDH. Pl.'s Exh. 172, at 10.

In Bradburn's experience, such minor tags would have ended the cycle and the tag would be placed into compliance via paper, where no survey is conducted. *Id.* ¶ 169. However, ISDH conducted a second PSR on December 20, 1996. *Id.* ¶ 171. This survey placed all of the previous tags into compliance; but the surveyors reexamined the entire facility and alleged three new minor violations. *Id.* ISDH did not break the original cycle that started with the August 29, 1996, annual survey. *Id.*

ISDH refused to perform another survey. *Id.* ¶ 172. On February 27, 1996, ISDH started decertification proceedings at Legacy's Portland East facility. *Id.* Legacy went to HFCA asking it to intervene on its behalf. *Id.* HCFA asked ISDH to review evidence from Legacy that Portland East was in substantial compliance. *Id.* Apparently, ISDH reviewed the evidence on February 24, 1997, and on March 6, 1997, HFCA informed the Portland East facility that it was in substantial compliance effective February 15, 1997. *Id.;* Pl.'s Exh. 33. Legacy did not receive notice from ISDH. Bradburn Decl. ¶ 172. Although Legacy was able to avoid decertification, it incurred automatic penalties in the amount of $177,949.55. *Id.* ¶ 173. In addition, public notice was sent to the local newspapers that Portland East's certification would be terminated, which created negative publicity for the facility. *Id.*

**b. Portland East 1997–1998**—Similarly, on August 15, 1997, an ISDH survey team consisting of Debbie Barth ("Barth"), Brenda Buroker ("Buroker"), Jeri Curtis ("Curtis"), and supervisor Scott, concluded an annual survey at Portland East. *Id.* ¶ 174. A cycle started on that date that would end on February 15, 1998. *Id.* ISDH performed a PSR on October 17, 1997, which was twelve pages long. *Id.* A second PSR took place on December 12, 1997. *Id.* ¶ 175. According to Bradburn, this should have been the last survey of

that cycle, but ISDH alleged that six tags, which had not appeared on the previous surveys, kept Portland East out of compliance. *Id.* One of the tags was an F490, which Bradburn claims improperly pyramided the other allegations in the survey to find another, separate charge. *Id.* The report justified the process by stating that the facility was unstable because of turnover in department heads. *Id.*

Bradburn contends that this allegation disregarded the fact that the Portland East Administrator, LeRoy DeRome ("DeRome"), lived one block from the facility and stopped in almost every day. *Id.* ¶ 176. Bradburn contends that the surveyors knew this about DeRome. *Id.* In addition, the Portland West facility was only three blocks away and the facilities helped each other when necessary. *Id.*

Legacy received the survey report on January 2, 1998. *Id.* ¶ 177. ISDH did not accept Portland East's plan of correction ("PoC") and would not schedule another survey. *Id.* Legacy turned to Spain at HCFA again, who directed ISDH to conduct another survey. *Id.* The third PSR was concluded on February 12, 1998, and placed the facility in substantial compliance. *Id.* By letter dated February 17, 1998, ISDH notified Portland East that it was in substantial compliance. *Id.* ¶ 178; Pl.'s Exh. 34. Bradburn contends that the facility was damaged because it had been denied payment for new admissions during the decertification period and through public notice of the noncompliance. Bradburn Decl. ¶ 178.

**c. Columbus 1997–1998**—ISDH survey team, Hash, Stewert and Sullivan, performed a survey dated November 20, 1997, with an end-of-cycle and decertification date of May 20, 1998, at Legacy's Columbus facility. *Id.* ¶ 179. In part because of Legacy's request for federal monitoring of its facilities, HCFA had chosen the Colum-

bus facility for a Federal Implementation Monitoring and Support Survey ("IMSS"), which occurred as part of this November 1997 survey. *Id.* The federal RO was Markovich, who attended three of the four days of the survey. *Id.*

While Markovich was in the building, the survey team was polite. *Id.* When Markovich left, she gave Legacy a letter that stated, in part: "In the case when a RO observer and the state agency are in serious disagreement regarding application of the survey protocol or interpretation of the requirements which result in a significantly flawed survey, the RO may consider scheduling a Federal Monitoring Survey." *Id.* ¶ 181. On the fourth and last day of the survey, at the exit conference, the ISDH team claimed that the facility was in bad shape, including having substandard quality of care. *Id.* ¶¶ 180, 182. However, the survey report Legacy received did not contain the significant or major allegations alleged at the exit conference. *Id.* ¶ 182.

Immediately after ISDH exited, Legacy contacted Spain at HCFA to request a Federal Monitoring Survey. *Id.*

On January 28, 1998, ISDH conducted a PSR, which alleged only three tags out of compliance. *Id.* ¶ 183. The next PSR began on March 23, 1998. *Id.* ¶ 184. Bradburn contends that the surveyors' attitudes were hostile. *Id.* Patti Allen ("Allen") and Banks joined the prior team as surveyors. *Id.* Allen was a social worker. *Id.*

In this survey, ISDH cited Columbus with tag F156, Notice of Rights and Services. *Id.* ¶ 185. ISDH stated that the information posted for the ISDH on the notice board was incorrect. *Id.* Apparently, ISDH had moved and the address was not correct. *Id.* In addition, ISDH had changed phone numbers several times and the phone number posted was the previous number. *Id.* Bradburn contends that this oversight was immediately remedied. *Id.* Moreover, Bradburn declares that the

numbers posted for Ombudsman, Adult Protective Services and FSSA were correct. *Id.*

Bradburn attests that, during the survey, Hash threatened to declare the Columbus facility in jeopardy if the facility did not immediately post, in "huge print," ISDH's complaint telephone number at the foot of each bed, in each lounge, in the dining room, in the activity room, in the therapy room, in the entryway and in each corridor. *Id.* ¶ 186. Bradburn states that this request was beyond state requirements. *Id.* But, Columbus complied. *Id.* There was no indication of any major alleged violations. *Id.* ¶ 187.

The survey exit date was April 2, 1998, but Legacy did not receive the report until April 17, 1998. *Id.* ¶ 188. The survey was released by Quality Review ("QR") on April 9, but was delayed in getting out to Legacy. *Id.*

Bradburn characterizes the allegations in the report as "specious." *Id.* ¶ 189. In addition, the Columbus facility was denied access to the resident identifier list. *Id.* ¶ 189. The resident identifier list is provided to the facility along with the report. *Id.* ¶ 190. In the actual report, residents' names are replaced with numbers, to protect their privacy, and the resident identifier list is the key to the report. *Id.* Because the resident identifier list had never been denied to a Legacy facility before, Legacy contacted Banks and Gwen Manning ("Manning") to ask that the list be faxed to it. *Id.;* Pl.'s Exh. 37. Manning stated that "legal" had instructed ISDH to withhold the list. Pl.'s Exh. 37. Legacy then contacted Diane Zaleski of the ISDH legal department who said it was a privacy issue. *Id.* Bradburn also contends that Legacy was told by ISDH personnel that the list was withheld because ISDH feared that Legacy would retaliate against the

residents responsible for complaints. Bradburn Decl. ¶ 190.

From this point forward, ISDH routinely withheld resident identifier lists from Legacy. *Id.* ¶ 191. Bradburn states that in his review of the public files, he could not find any other instance in which the resident identifier list was withheld from a provider. *Id.* ¶ 192. Moreover, Margaret Ellis ("Ellis") testified in her deposition on May 30, 2006, that a facility is provided a resident identifier list at the end of a survey or at the exit. Ellis Dep. at 16.

Without the resident identifier list, Legacy was at a disadvantage to investigate the allegations itself and then to submit a PoC within the given time frames. Bradburn Decl. ¶ 194. Faced with this difficulty, Legacy submitted a PoC, but turned to Spain at HCFA for help. *Id.* By letter dated April 20, 1998, Legacy asked Spain for help at the Columbus facility and again requested a Federal Monitoring Survey. *Id.* ¶ 195; Pl's Exh. 36. Legacy again contacted Spain, via letter dated April 29, 1998. Bradburn Decl. ¶ 196; Pl.'s Exh. 37. Again Legacy requested a Federal Monitoring Survey; in addition, Legacy requested a meeting with ISDH and HCFA. Pl.'s Exh. 37. Further, Legacy gave Spain further information about its difficulty responding to a survey without the resident identifier list. *Id.* Finally, Legacy requested fair treatment. *Id.*

On May 18, 1998, ISDH began another survey of the Columbus facility. Bradburn Decl. ¶ 199. Bradburn contends that the prior surveys had attacked the facility's Activity/Social Services Department ("ASSD"). *Id.* More specifically, Columbus' ASSD Director resigned shortly after the January survey. *Id.* For the April survey, Legacy had hired qualified home office employees to cover the department, however, the surveyors had refused to recognize them as employees because they were volunteers. *Id.* As a result, in the April survey, ISDH had rated the ASSD with two "H" severity ratings; apparently a rarity. *Id.* ¶ 200. But after the April survey and prior to the May survey, the Columbus facility had hired new employees in ASSD. *Id.* During the May survey, Bradburn contends that the survey team told the Columbus facility residents that ASSD had violated their rights. *Id.* Bradburn states that this was a lie and that the Columbus facility contacted Spain immediately. *Id.* Spain requested that Legacy send its concerns in writing. *Id.* ¶ 201.

By letter dated May 21, 1998, while the survey was in progress, Legacy informed Spain of the difficulties it was having with the survey team and its allegations about how the Columbus facility's new ASSD Director had handled a particular transfer problem. Pl.'s Exh. 38. The Columbus facility reported that the survey team refused to listen to the ASSD Director, refused to listen to the Ombudsman who tried to argue on the facility's behalf, and that the team had upset the residents with their inquiries into the matter. *Id.* The letter also notified Spain that the Columbus facility had contacted Adult Protective Services to ask for help in protecting its residents from the survey team. *Id.* Finally, the letter expressed concern about the efficacy of the survey. *Id.*

Legacy received the report from the May 22, 1998, survey on June 3, 1998. Bradburn Decl. ¶ 205. On the survey report PoC, it expressed its objection to the failure of ISDH to break the cycle started with the survey of November 20, 1997, because there were no findings related to the deficiencies found in November 1997, or the PSR on January 28, 1998. Pl.'s Exh. 39. Specifically, Legacy stated:

The provider objects to the form of the survey report (2567). There were no findings as related to the PSR X 3 to the survey of November 20, 1997. There

are also no findings as related to the PSR × 2 to the January 28, 1998[,] survey. As per survey protocol and past practice, there should have been a survey report (2567) with no deficiencies cited as related to the PSR to November 20, 1997[,] and the PSR of January 28, 1998. This plan of correction relates to the finding for the PSR to the April 20, 1998[,] survey and the new findings unrelated to the PSR.

*Id.* Nevertheless, the letter accompanying the May 1998 survey report announced that ISDH was recommending that HCFA terminate the Columbus facility's Medicaid certification. Bradburn Decl. ¶ 206.

Legacy disputed the following findings from the May 1998 survey: F177, refusal to transfer, for the reasons cited in Legacy's May 21, 1998, letter to Spain; F278, resident assessment, where the surveyors removed from the staff's desk an assessment in progress, and found the facility out of compliance on this issue because the form had not been signed. *Id.* ¶¶ 207–08.

In addition, Legacy was again denied the resident identifier list even though there were no complaints alleged as part of the survey. *Id.* ¶ 209.

Because Legacy felt that the allegations in the May 1998 survey report were either false or misleading, it again contacted Spain. *Id.* ¶ 210. By letter dated June 11, 1998, Legacy asked that HCFA not accept ISDH's recommendation to terminate the Columbus facility's Medicaid certification. Pl.'s Exh. 40. In response, Spain indicated that he would stay termination pending review of Legacy's PoC for Columbus. Bradburn Decl. ¶ 211.

Legacy submitted its PoC to Spain and ISDH on June 22, 1998. *Id.* In addition, Legacy sent a letter to Spain directing his attention to the policy and procedure violations that Legacy perceived were taking place at the Columbus facility. Pl.'s Exh. 40. The letter also claimed that Legacy's

facilities were being treated differently than others providers. *Id.*

Rather than immediately terminating the Columbus facility's Medicaid certification, Spain stated that the would extend the cycle and ordered ISDH to conduct another survey. Bradburn Decl. ¶ 212. That survey was conducted on June 29–30, 1998. *Id.* The survey team was Hash, Stewart, Sullivan and Banks. *Id.* ¶ 213; Pl.'s Exh. 42.

On July 7, 1998, Legacy received a copy of the report. Bradburn Decl. ¶ 213. The report cited a new complaint that was partially verified or substantiated related to pressure sores and the facility's treatment, or sub-standard treatment of them as to two residents, one of which was a hospice resident. Pl.'s Exh. 42; Bradburn Decl. ¶ 213.

On July 9, 1998, Legacy received a letter from Spain dated July 8, 1998, in which Spain stated:

At our request, the ISDH revisited your facility on June 30, 1998. While an isolated deficiency was cited at 42 CFR 483.25 Quality of Care (F314), we have determined that the development of the pressure sore was unavoidable. Our decision was based, in part, on a letter from Dr. Joseph C. Sheehy, M.D. The letter provided additional information relating to the physical and mental status of the resident cited in the deficiency. Your facility attained the requisite substantial compliance with the participation requirements effective June 24, 1998.

Pl.'s Exh. 43. However, the letter also delineated that the Columbus facility would need to pay a civil fine of $12,350.00 for the period during which the facility was found not in substantial compliance. *Id.* The facility also suffered through a ban on payment for new admissions during the period between March 20, 1998 and June

23, 1998. Bradburn Decl. ¶ 217. Articles appeared in the Columbus newspaper about the facility's problems as well, further damaging Legacy's public relations. *Id.*

By letter dated July 14, 1998, ISDH also notified Legacy of the HCFA's finding: "The Health Care Financing Administration has determined that F314 will be deleted [from the survey of June 30, 1998]. The 2567 will reflect the change." Pl.'s Exh. 44. On August 3, 1998, Legacy received the revised survey report stating that the facility was in substantial compliance. Bradburn Decl. ¶ 216; Pl.'s Exh. 45.

**d. New Castle Community Care Center 1997–1998**—Prior to July 1997, Legacy's New Castle facility's most severe allegation had been a single "E." Bradburn Decl. ¶ 220. The annual survey that concluded on February 25, 1997, cited minor deficiencies. *Id.*

Another survey was conducted by Banks that concluded on July 25, 1997. *Id.* ¶ 221. With seven alleged tags and a substandard quality of care allegation, the survey was the worst in New Castle history. *Id.*

Another cycle-breaking issue occurred based on a February 6, 1998, annual survey performed at New Castle by Ellen Adams ("Adams"), Peggy Summers ("Summers"), Patricia Ward ("Ward") and Allen. *Id.* ¶ 222. Banks was the supervisor. *Id.* Legacy received the report on February 27, 1998, and the end of the cycle was set for August 6, 1998. *Id.* No adverse action occurred at the time of the report. *Id.* ¶ 223. But, on March 31, 1998, ISDH issued a "Notice of Citation" alleging that the February survey called for a $4,000.00 fine. *Id.* Legacy appealed. *Id.*

Bradburn contends that the February 6, 1998, report contained many errors. *Id.* ¶¶ 222, 224. One of the deficiencies alleged in the report was tag F314 for pressure areas. *Id.* ¶ 224. According to ISDH

this deficiency was so severe it constituted substandard quality of care. *Id.* ¶ 225. According to a HCFA report, called the "OSCAR 4 Report," generated on June 12, 1998, New Castle had 5% of its residents with pressure areas. *Id.* ¶ 224. The statewide average at the time was 6.3%; the national average was 7.0%. *Id.* Moreover, the OSCAR 4 Report indicated that a tag F314 at any level of severity was alleged in only 15% of the facilities in Indiana, and only 18% nationally during the same time frame. *Id.* ¶ 225. Bradburn found it difficult to believe the February 6, 1998, survey report allegations in light of the OSCAR 4 Report statistics for the same period of time. *Id.* Similarly, with respect to weight loss, another factor measured by the OSCAR 4 Report, 2.5% of New Castle's residents had significant weigh loss, compared to 8.1 % statewide and 7.5% nationally. *Id.* ¶ 226.

The first PSR in the February survey cycle was concluded on April 15, 1998. *Id.* ¶ 227. No direct administrative action was taken based on this survey; however, the next PSR was to occur between thirty and forty-five days after the previous exit, but did not begin until sixty days after the exit. *Id.* On June 18, 1998, the next PSR concluded. *Id.* ¶ 228.

Bradburn alleges that ISDH had taken the position that it was only required to perform three surveys in a cycle; if it did not find the facility in substantial compliance, even if the cycle had not concluded, the facility would be decertified after the third survey. *Id.* ¶ 228. Bradburn contends that this was Hornstein's decision. *Id.*

RO, Peg Enright ("Enright"), attended the June 18, 1998, survey. *Id.* ¶ 229. Bradburn observed that there were disagreements between the ISDH survey team and Enright. *Id.* In addition, Banks did not participate in this survey. *Id.*

Legacy received the report from the June 18, 1998, survey on June 30, 1998. *Id.* ¶ 230. However, the QR date for the survey was June 23, 1998, which is the date the report would have been final. *Id.* The cover letter on the report is dated June 29, 1998, but the date on the second page is June 26, 1998. Pl.'s Exh. 46. The letter informed Legacy that ISDH was going to recommend termination of Medicaid coverage at New Castle effective August 6, 1998. *Id.* Hornstein signed the letter. *Id.*

Legacy disputed the allegations made in the report; some directly within the PoC on the survey. Pl.'s Exh. 47; Bradburn Decl. ¶ 231. In addition, Legacy sent a copy of its PoC to Spain at HCFA. Pl.'s Exh. 167. In the letter, Legacy contends that with respect to tag F371, apparently regarding the cleanliness of the facility and, in particular, the floor of the kitchen, the surveyor had told the Food Service Supervisor that the floor was dirty. *Id.* The Food Supervisor and the other staff told the supervisor that the floor was clean, however, looked dirty because of the hard water problem in the area. *Id.* Legacy remopped the floor and asked that the surveyor return to the area to reinspect it; the surveyor refused. *Id.* Apparently, in part at Enright's urging, the surveyor did return to the kitchen, but did not change her earlier finding; in addition, the surveyor reported that the dietary manager agreed with her finding. *Id.* (citing Report, F317 Finding).

Apparently, Legacy met with Spain and ISDH personnel on July 23, 1998, and as a result of that meeting and Legacy's letter to Spain regarding the June 18, 1998, survey report, HCFA extended the cycle and ordered ISDH to perform another survey. Bradburn Decl. ¶¶ 234, 239. That PSR began on August 19, 1998, and concluded on August 21, 1998. *Id.* ¶ 234. Springer, Corporate Operations Coordinator for Legacy during the relevant period, observed the surveyors, Adams, Ward and Summers, during that survey. Springer Aff. 4, ¶¶ 1, 6–8. On August 19, 1998, Springer heard Adams confront the Director of Nursing ("DON") at New Castle. *Id.* ¶ 8. Adams told the DON it would benefit her to find another job elsewhere. *Id.* Springer immediately stepped in and terminated the conversation because no legitimate survey function was being performed. *Id.*

That same day, the surveyors left the facility at around 4:00 p.m., telling Springer before they left that they had nothing to report and would see her the next day. *Id.* ¶ 9. Springer left the facility around 5:00 p.m. *Id.* The surveyors returned to the New Castle facility around 6:15 p.m. that day; the New Castle staff notified Springer that the surveyors had returned. *Id.* Because another home office employee was there, Springer did not return to the facility at that time. *Id.*

Around 8:00 p.m., Springer received another call from the New Castle facility asking for her help. *Id.* ¶ 10. Springer was advised that the surveyors were telling the home office employee she should not be there and were accusing the staff of not caring about the residents. *Id.* Springer understood that several staff members were in tears and threatening to walk out. *Id.* Upon hearing this, Springer immediately left for New Castle. *Id.*

When Springer arrived, she assessed the situation and confronted the surveyors. *Id.* The surveyors refused to talk with her. *Id.* They abruptly ended the survey and left the building again. *Id.*

The survey report indicated that New Castle was out of compliance citing three tags, F241, F318 and F498, all with scope and severity levels of "E." Bradburn Decl. ¶ 236. None of the these tags were consis-

tent throughout this PSR cycle, which should have stopped the cycle. *Id.*

Instead of submitting a PoC, Legacy sent a letter, dated September 2, 1998, and attachments to Spain at HCFA refuting the allegations in the August 19–21, 1998, survey report. Springer Decl. 4, ¶ 12; Pl.'s Exh. 168. The letter and attachments provide specific information and evidence that the facility was either following specific protocol, specific patient instructions, or specific physicians instructions with respect to each of the alleged substandard findings. Pl.'s Exh. 168; Pl.'s Exh. 48.

By letter dated September 16, 1998, Legacy was informed by HCFA that while the August 21, 1998, revisit found deficiencies, HCFA would accept the September letter as a plan of correction and documentation. Pl.'s Exh. 49. HCFA concluded that the New Castle facility had attained substantial compliance effective August 21, 1998. *Id.* Termination of New Castle's participation in Medicaid would not be effectuated, however, the civil fine for the failure to comply with federal regulations amounted to $9,000.00. *Id.* In addition, the HCFA noted that Legacy had requested a hearing regarding the initial noncompliance determination that resulted in the fines. *Id.*

Bradburn claims that the New Castle facility lost an addition $32,000.00 in denial of payment for new admissions, and additional loss of reputation because of the public notice of decertification. Bradburn Decl. ¶ 238.

**e. Portland West 1998**—On May 22, 1998, ISDH concluded a survey at Legacy's Portland West facility. *Id.* ¶ 242. Scott was the supervisor and Barth, Burocker, and Curtis were the survey team; the same team who were involved with Legacy's Portland East facility in late 1997 and early 1998. *Id.* Bradburn contends that the survey alleged only minor viola-tions. *Id.* The end of cycle date was November 22, 1998. *Id.*

On the second PSR, one tag was alleged still out of compliance, however, Legacy disagreed and took its complaint to Wolfe at HFCA, who had replaced Spain as Legacy's contact. *Id.* ¶ 243. Apparently after that PSR, ISDH recommended that HFCA decertify Portland West for the one remaining tag. Pl.'s Exh. 51.

On November 13, 1998, Brenda Roush ("Roush"), from ISDH conducted a complaint survey and found the facility in substantial compliance. Bradburn Decl. ¶ 247.

On Sunday, November 15, 1998, Scott conducted a third PSR at the facility. *Id.* ¶ 248. Scott found the facility out of compliance with a few tags. Pl.'s Exh. 51. With the cycle set to end only a few seven days later, Legacy turned to Wolfe at HFCA. Bradburn Decl. ¶ 248.

Via letter dated November 20, 1998, Legacy informed Wolfe that the problems identified by the surveyors in both the second and third PSRs were at most minor; specifically having two medications in the refrigerator that should have been discarded. Pl.'s Exh. 51. In addition, Legacy informed Wolfe that it had thrown away the offending vials while the surveyors watched. *Id.* Legacy argued that because the problems were technicalities that were corrected on the spot, the Portland West facility was in substantial compliance. *Id.*

Further, Legacy pointed out that Barth had called in a complaint against the Portland West facility during the second PSR. *Id.;* Bradburn Decl. ¶ 244. Upon survey by the team, the facility was found in substantial compliance with respect to this allegation. Pl.'s Exh. 51. The Court notes that Hornstein testified in her May 31, 2006, deposition that an ISDH surveyor complaint would be unusual and she would not know why it would occur.

Hornstein May 31, 2006, Dep. at 40. Hornstein did agree that it would trigger another survey. *Id.*

In response to Legacy's letter, Wolfe extended the cycle until March 24, 1999. Bradburn Decl. ¶ 249. Although this kept Portland West's certification alive, the penalties continued to mount. *Id.*

ISDH did not accept Legacy's PoC for the November 15, 1998, survey because Legacy would not admit to any deficient practice. *Id.* ¶ 250. By letter dated December 17, 1998, Legacy submitted an addendum. Pl.'s Exh. 52. Apparently, Scott noted that she would not approve it and "need Feds input." *Id.*

With the decertification deadline extended, ISDH sent Scott to Portland West on February 3, 1999, do complete a survey.[5] Bradburn Decl. ¶ 253. When Scott arrived, she asked for a letter from the administrator of the facility regarding transfer of administrative authority at the facility within twenty minutes or she would call her supervisor. *Id.* ¶¶ 256, 263. The administrator was not in the building at the time. *Id.* ¶ 256.

At the time of this survey, Norman Cutwright ("Cutwright") was administrator at Portland East. *Id.* ¶ 258. Licensed in Ohio, Cutwright had a temporary Indiana license. *Id.* He had been at the facility for the previous three surveys. *Id.* Because of the difficulties with the prior three surveys and his difficulties in obtaining a permanent Indiana license, Cutwright had resigned his position and was on vacation during the February 3, 1999, survey. *Id.* Cutwright had not sat for the Indiana licensing exam because he had resigned. *Id.* ¶ 259. During the February 3, 1999, survey, the surveyors maintained that even though Cutwright's temporary license had

not expired, since he had not sat for the Indiana exam, the temporary license was void. *Id.*

But, Legacy had a second administrator on the payroll at the time of the February survey; Raymond Bell ("Bell") had been hired on December 1, 1998. *Id.* ¶ 260. Bell was also licensed in Ohio and had been going through the process of obtaining a temporary license. *Id.* Bell was assigned to the Portland West facility and functioned as an assistant administrator pending receipt of his temporary license. *Id.* Bell was approved to sit for the licensing exam in January, which meant all of the requirements for a temporary license had been met, but Bell did not have the temporary license in February 1999. *Id.* The surveyors refused to recognize Bell as an administrator because of this licensing issue. *Id.* ¶ 261.

As a result of the surveyors' findings, they mandated that Legacy hire another administrator for Portland West. *Id.* Legacy hired an additional interim administrator. *Id.*

Apparently, Scott knew from her previous visits that Portland West had problems locating a part for their fire alarm system in Zone 5 of the building. *Id.* ¶ 264. During the February survey, the surveyors requested that a life safety inspector perform an inspection of the facility. *Id.* ¶ 265. Gerald Seiffertt ("Seiffertt") performed the inspection and made no findings and declared the building safe. *Id.* Seiffertt pointed out to Scott, in front of facility staff, that the building had gone beyond regulations. *Id.* Nonetheless, the surveyors found safety issues amounting to serious jeopardy. *Id.* In fact, ISDH declared "retroactive jeopardy." *Id.* ¶ 254.

---

5. Bradburn's declaration states that this survey occurred at Portland East, however, all of the surrounding paragraphs and information refer to employees or statistics regarding Portland West. Therefore, the Court will presume that Bradburn intended to refer to Portland West in this paragraph.

The survey report indicated that Legacy had been putting residents of the Portland West facility in jeopardy since December 11, 1998, and assessed a fine of $3,050.00 per day from December 11, 1998, through February 3, 1999, or a total of $164,700.00. *Id.*

The surveyors mandated that Legacy place someone in Zone 5 of the building on twenty-four hour, around-the-clock "fire watch." *Id.* ¶¶ 264, 266. This person sat a few feet from a manned nurses' station. *Id.* ¶ 266. In addition, Scott required Legacy to install another, parallel smoke detector system in the event the existing one went down. *Id.*

Through two letters dated March 10, 1999, Legacy informed Spain that the company planned to challenge ISDH's findings of retroactive jeopardy and asked that HCFA not accept ISDH's recommendation. Pl.'s Exhs. 53 & 54. In addition, Legacy informed Spain that it was challenging the entirety of ISDH's findings with respect to the Portland West facility. Pl.'s Exh. 54. Apparently, Legacy also wrote Wolfe about its objections to the February survey. *Id.*

By letter dated May 27, 1999, Spain informed Portland West that HCFA had concluded that the facility was in substantial compliance with its requirements as of February 5, 1999. Pl.'s Exh. 55. The letter stated that the agency would not terminate the facility's Medicare/Medicaid agreements effective April 26, 1999, and would discontinue its denial of payment for all new Medicare/Medicaid admissions as of February 5, 1999. *Id.* On May 28, 1999, a public notice stated that the agency had now determined that Portland West had attained substantial compliance. Pl.'s Exh. 56.

Legacy claims that despite not its retention of certification at Portland West, the episode cost the company $141,887.93 in denial of payment for new admissions, and lost valuable employees at Portland West. Bradburn Decl. ¶ 270. Portland West's image was also damaged by press released by ISDH dated March 22, 1999, for the November 15, 1998, survey findings, and dated April 13, 1999, for the February 5, 1999, survey findings. *Id.;* Pl.'s Exh. 57.

**f. North Vernon 1998**—As previously discussed, without a copy of its license, North Vernon could not get certified for Medicare, therefore, it was a Medicaid only facility over which HCFA had no authority. Bradburn Decl. ¶ 271. ISDH performed an annual survey at North Vernon that concluded on June 5, 1998. *Id.* ¶ 272. Defendant A. Connell conducted the survey; defendant Powers was the supervisor. *Id.* This survey team conducted three PSRs on the following dates: August 9, 1998; September 24, 1998; November 13, 1998. *Id.*

By letter dated November 25, 1998, Legacy complained to Wolfe about unequal treatment by A, Connell and emphasized, as an example, a specific tag from the surveys, tag F272 for documentation. *Id.* ¶ 273; Pl.'s Exh. 58. At the very least, Legacy requested another survey. Pl.'s Exh. 58. Apparently, Wolfe agreed to the request and asked ISDH to perform another survey. Bradburn Decl. ¶ 273.

ISDH performed another survey on December 4, 1998. Springer Decl. 5, ¶ 4. A. Connell performed that survey as well. *Id.* ¶ 5. Legacy disputed each finding from the survey and alleged that the survey team had manufactured findings, disrupted services and upset residents during the survey. *See, generally, id.*

ISDH issued a termination notice on December 10, 1998. Bradburn Decl. ¶ 275. On December 11, 1998, Legacy filed a Petition for Review and Stay of Effectiveness, which was assigned the administrative action number M–165–98. *Id.;* Springer Decl. 5, ¶ 19. On December 18,

1998, the ALJ held a hearing on the issue of the stay. Bradburn Decl. ¶ 275; Pl.'s Exh. 59. Shortly after ISDH's attorney admitted that there was no immediate jeopardy to the safety of the residents, the ALJ issued the stay to prevent unnecessary transfer of the residents. Pl.'s Exh. 59, at 97–99. According to Bradburn, M–165–98 was formally dismissed on January 8, 2001. Bradburn Decl. ¶ 277.

**g. Portland East 1999**—This cycle began with an annual survey that concluded on August 8, 1998. *Id.* ¶ 278. A cycle end date of April 6, 1999, was set. *Id.* The second survey showed three minor tags. *Id.* The third survey had a single "D." *Id.* Instead of using a "paper compliance" survey, ISDH surveyed the facility a fourth time and again found a single "D." *Id.*

Legacy appealed the finding to HCFA. *Id.* ¶ 279. Wolfe reviewed Legacy's materials and found the facility in substantial compliance as of April 6, 1999, and reduced the level "D" finding to a "B." Pl.'s Exh. 60. Wolfe also acknowledged Legacy's request for a hearing regarding the matter. *Id.*

**h. Columbus 1999**—A cycle began at Legacy's Columbus facility on October 15, 1998, when ISDH performed an annual survey. Bradburn Decl. ¶ 280. The cycle end date was set for April 15, 1999. *Id.* Bradburn asserts that the second PSR was benign enough that they thought they would have received a paper compliance survey next. *Id.* However, ISDH conducted a third PSR, which concluded on May 17, 1999. *Id.* ¶ 281. After that PSR, ISDH recommended termination. *Id.* Legacy appealed to HCFA, submitting

documentation to refute the allegations in the third PSR report. *Id.;* Pl.'s Exh. 61. According to Bradburn, HCFA extended the cycle and ordered ISDH to revisit the Columbus facility again. Bradburn Decl. ¶ 282.

A June 30, 1999, survey report indicated that the Columbus facility was in substantial compliance. Pl.'s Exh. 62. Legacy claims that the wrongful extension of the cycle in this case cost Legacy $132,211.20 in denial of payment for new admissions, and monetary penalties in the amount of $12,350.00. Bradburn Decl. ¶ 283. In addition, Legacy suffered in lost staff and lost reputation from the public notices issued during this period. *Id.*

**H. JEOPARDY ALLEGATIONS**[6]

Bradburn summarizes that Legacy had zero jeopardy allegations from the mid 1980s until 1996. *Id.* ¶ 290. In 1996, the company had two jeopardy allegations; in 1997 it had an additional two jeopardy allegations; in 1998, there were no jeopardy allegations. *Id.* However, in 1999, Legacy had eight jeopardy allegations. *Id.*

According to Defendants, from January 1, 1995, through March 8, 2004,[7] ISDH cited 405 instances of substandard quality of care ("SSQC") in nursing homes, NFs, in Indiana, nine of which were at Legacy facilities. Hornstein Decl. ¶ 10. During the same period, ISDH cited 204 instances of immediate jeopardy, six of which were at Legacy facilities. *Id.* From January 1, 1995, to March 8, 2004, ISDH found thirty-six instances of immediate jeopardy in ICF/MR facilities throughout Indiana, two

---

6. The Court notes that, consistent with the Court's earlier ruling on the subject, a significant number of allegations set forth in Bradburn's declaration with respect to jeopardy allegations were not considered by the Court because Legacy did not specifically delineate

them or refer to them in its statement of facts in dispute.

7. The Court notes that this date is only significant because it is just prior to the date upon which Defendants filed their Motion for Summary Judgment.

of which were at Legacy's New Horizon facility. *Id.* From 1996 to March 8, 2004, ISDH filed 209 licensure actions, sixteen of which were against Legacy facilities. *Id.* From 1996 to March 8, 2004, ISDH filed 449 citations, seventeen of which were against Legacy facilities. *Id.*

### 1. *1997 Seymour Jeopardy Allegation*

On January 23, 1997, ISDH started an annual survey at Legacy's Seymour facility. Bradburn Decl. ¶ 352. The survey spanned from January 23 through February 11, 1997. *Id.* It was the longest survey in Seymour's history, extending over twenty days; the longest previous survey at the facility took five days. Springer Decl. 2, ¶ 7. The administrator at Seymour, Sandra Francis ("Francis"), and Springer were suspicious about the timing of the survey because the facility was not due for its annual survey until April 19, 1997, or after. *Id.* ¶ 5. They were also concerned because the survey team that showed up at Seymour was the same team that had performed the difficult survey at North Vernon on January 17, 1997. *Id.* When Francis contacted Springer and told her that something was wrong, Springer warned Francis to be on her guard because this particular team was not to be trusted. *Id.* ¶ 6.

During the course of the survey, the surveyors interfered with the regular operation of the facility by, for example, following employees too closely and questioning them so much they could not perform their job in a timely manner. *Id.* ¶¶ 9–12; Pl.'s Exhs. 139–41. On January 28, A. Connell went to Francis and claimed that the surveyors had been told that one of the employees had lice and was treating herself with dog shampoo. Springer Decl. ¶ 17; Pl.'s Exh. 143. The employee was not working that day and Francis contacted her at home. Pl.'s Exh. 143. The employee said she did not have lice and would show the surveyors. *Id.* When

Francis reported this to A. Connell, she said it was not necessary. *Id.*

Springer claims that the stress wore on the staff and that on day eight of the survey, on January 30, a cook resigned as a result of the stress. Springer Decl. 2, ¶ 18.

On January 31, S. Connell told Francis that the team was considering declaring "Serious and Immediate Jeopardy" at the facility. *Id.* ¶ 19. No details about the alleged substandard practices were provided to Francis at that time. *Id.*

On Saturday, February 1, at 2:45 p.m., Jeannine Hiatt ("Hiatt"), an ISDH monitor, arrived at the facility. *Id.* ¶ 20. Hiatt presented to the ADON at the Seymour facility an "Emergency Order for Placement of a Monitor and Order Banning New Admissions" ("Emergency Order") and an "Agreement for Services of Monitor." *Id.* The Emergency Order was dated January 31, 1997, and was signed by Hornstein. Bradburn Decl. ¶ 359; Pl.'s Exh. 76. The Emergency Order states, in part: "This Order is necessitated by the determination by the Director that the health, safety, security, rights or welfare of the patients cannot be adequately assured during the pendency of a revocation of license procedure or placement on a probationary license." Pl.'s Exh. 76. This statement paraphrases Indiana Code § 16–28–7–1, Pl.'s Exh. 65, which establishes when the director of ISDH has the authority to issue an order to place a monitor. There was no licensure action pending against Seymour at the time; nor was the facility operating under a probationary license. Bradburn Decl. ¶ 360.

The ADON called Francis and Springer. *Id.* Springer instructed the ADON not to sign anything and to put Hiatt on the phone. *Id.* Springer informed Hiatt that Legacy would not be entering into a contract with her. *Id.* Springer also asked

that Hiatt wait for Francis to arrive before touring the building. *Id.* Instead, Hiatt conducted a "preliminary inspection" and left before Francis arrived. *Id.*

Hiatt returned on February 3 with the survey team and acted like a surveyor. Springer Decl. ¶ 22. At the end of the day on February 3, S. Connell informed the facility staff that there was a potential for jeopardy, but provided no details of the survey team's observations that would support such a finding. *Id.* ¶ 23. A similar pattern followed on February 4, 5, 6, 7, and 8; the survey team would spend time in a conference room, disperse throughout the facility, then return to the conference room. *Id.* ¶ 24. At the end of each day, S. Connell would inform the Seymour facility staff that there was a potential for jeopardy but not inform them of the team's findings. *Id.*

Meanwhile, after a hearing regarding the North Vernon facility on February 5, Legacy's attorney asked ISDH's attorney, Nover, to remove the monitor at Seymour because Hornstein had issued the Emergency Order without proper authority. Bradburn Decl. ¶ 362. On February 7, 1997, ISDH filed a "Complaint and Request for Hearing" to revoke Seymour's license. *Id.* ¶ 363. The Complaint was signed by Nover and Hornstein. *Id.* The matter was assigned cause number C–542–96, which would indicate an action commenced in 1996; the number was later changed to C–542–97. *Id.* ¶ 364.

On Sunday, February 9, Keifer entered the building and announced that jeopardy had been declared because of dangerous situations related to thickened fluids, tag F309. Springer Decl. 2, ¶ 25.

On February 10, the survey team arrived and said they would perform an exit conference, however, the team spent the entire day in the conference room and did not perform an exit conference. *Id.* ¶ 26. On February 11, the survey team conduct-ed the exit conference and informed the facility that it was assigning the facility three jeopardy allegations, two of which Legacy did not know about. *Id.* ¶ 27. The main jeopardy allegation was that the facility was starving its residents. *Id.*

When given an opportunity to speak, Springer asked S. Connell if jeopardy is alleged during a survey, can the facility correct it. *Id.* ¶ 28. S. Connell replied that the facility has the right to correct it, but it was not their protocol to inquire if the jeopardy had been abated, rather it was the facility's responsibility to bring the correction to the survey team's attention. *Id.* Springer then inquired about how the facility was to correct things that it had not been informed of. *Id.* The team did not answer. *Id.*

When the exit conference concluded, Springer called Spain at HCFA to ask for his help. *Id.* ¶ 29. Apparently Spain refused to discuss the situation until after he had seen ISDH's report. *Id.*

Several employees at the facility resigned after the survey because of the behavior of the survey team. *Id.* ¶ 30.

Legacy received the survey report two days after the surveyors exited. *Id.* ¶ 31. It was 124 pages long and contained approximately 118 allegations of substandard care. *Id.* ¶¶ 31, 57. In its PoC, delivered to ISDH on February 26, Legacy challenged each of the allegations citing and supplying documentary evidence to the contrary of the survey team's findings. *Id.* ¶¶ 34–53; 55–56; Pl.'s Exhs. 148–60. On March 4, 1997, Powers, faxed a letter to the Seymour facility declaring that the PoC had not been accepted. Springer Decl. 2, ¶ 57. By letter dated March 10, 1997, Springer responded to Powers answering Powers' specific inquiries and incorporating the Seymour facility's original PoC. *Id.* ¶ 58. Springer copied her March 10 letter to Spain and Legacy's lawyer.

*Id.* ¶ 59. Springer called Spain to confirm that he received the letter. *Id.*

On March 10, 1997, A. Connell, S. Connell, Keifer and Pixley from ISDH entered the Seymour facility to conduct an abatement survey. *Id.* ¶ 60. S. Connell accused Springer of changing the resident documentation. *Id.* Springer informed S. Connell that she was being ridiculous and that even if Legacy had needed or wanted to do such a thing, it would have to involve the doctors, dieticians, therapists and so on. *Id.* S. Connell then claimed that it was indeed a conspiracy and that the doctors had falsified documents as well. *Id.*

On March 11, 1997, Springer received a phone call from Spain who indicated to Springer that if she could prove that what she was saying in her March 10, 1997, letter was true, particularly with respect to residents # 9, 10 and 2, he would believe her on the rest of the documentation to support her side of the story. *Id.* ¶ 61. Springer told Spain that all he would have to do is call the ISDH office and ask it to fax to him a copy of the residents' records, which had been copied by the survey team, and should be in the confidential file. *Id.*

On March 12, 1997, Spain called Springer and told her that her information had checked out. Springer Decl. 2, ¶ 62. The survey team was still at the Seymour facility and Springer observed that, after that day, the team stopped harassing the staff. *Id.*

On March 13, S. Connell informed Springer that "the office had instructed them that the abatement survey was over and that they were to go ahead and complete the PSR." *Id.* ¶ 63. The PSR concluded on March 17. *Id.* ¶ 64. The survey team had spent most of their time in the conference room. *Id.*

The result of the PSR was one minor tag that did not require further PSRs. *Id.* Springer declares that there was no change in operations at the Seymour facili-

ty between the February 1997 survey and the March 1997 PSR. *Id.* ¶ 65.

Francis resigned as Administrator at Seymour shortly thereafter. Bradburn Decl. ¶ 374.

With respect to the administrative proceedings initiated during the February 1997 survey, the ALJ dismissed the proceeding on August 17, 2000, because no response had been filed in opposition to the motion to dismiss. Pl.'s Exh. 77.

In addition to the administrative proceedings that pended regarding this matter, to prevent loss of the license at the Seymour facility, shortly after the exit survey in February 1997, Legacy filed a motion for temporary restraining order and amended its complaint for preliminary and permanent injunction to include Seymour in an action then-pending in the Jennings County Circuit Court. Blackburn Decl. ¶ 367. Two Seymour residents joined in the suit as plaintiffs. *Id.*

At this point, Hornstein suggested settling the cases pending regarding licensing at North Vernon and Seymour. *Id.* ¶ 376. The parties conducted negotiations and arrived at terms. *Id.* Mason drafted the settlement agreement, however, Legacy took issue with its terms because it required Legacy to admit it had been guilty of things that it maintained it had not done. *Id.* Legacy refused to sign the document. *Id.*

**2.** *1997 Columbus Jeopardy Allegation*

Meanwhile, at Legacy's Columbus facility, on December 16, 1996, a new administrator took the helm. Springer Decl. 3, ¶ 4.

On March 11, 1997, ISDH concluded a complaint survey at the facility. *Id.* ¶ 5. The survey report indicated a few "D" allegations. Bradburn Decl. ¶ 383. There were no deficient staff allegations in that survey report. *Id.*

From its self-assessment in April 1997, Legacy thought the Columbus facility was in good shape and that the ISDH survey completed the prior month was "not far off." *Id.* ¶ 384. A program to address improvements was set to begin in May. *Id.* Many of those improvements were in place by mid-May. *Id.* ¶¶ 384–85.

On May 12, 1997, the new administrator resigned citing concern for what had occurred at North Vernon and Seymour. Springer Decl. 3, ¶ 7.

On May 13, 1997, ISDH returned to Columbus to start a PSR survey. *Id.* ¶ 8; Bradburn Decl. ¶ 384–85. The survey team consisted of Hash, Holly Sullivan ("Sullivan"), and Diana Stewart ("Stewart") with Banks as supervisor. Springer Decl. 3, ¶ 8; Bradburn Decl. ¶ 385. The first two days of the survey progressed normally. Springer Decl. 3, ¶¶ 9 & 10; Bradburn Decl. ¶ 386. However, on the third day, May 15, 1997, the team stated that the facility was in such good shape that they did not need a daily exit conference and they left around 2:30, letting everyone know they would be back the next day. Springer Decl. 3, ¶ 11. However, Hash and Sullivan returned to the facility at 6:00 p.m., after the administrative staff had left for the day.[8] *Id.* ¶ 12. This was the time of day that the staff would be helping residents finish dinner, toilet them after dinner, giving them evening care and readying them for bed. *Id.* ¶¶ 12–13. Instead of allowing the staff to perform their normal functions, Hash and Sullivan told them to stop what they were doing so that they could do a complete skin assessment of each individual. *Id.* ¶¶ 12–14. The surveyors told the staff that no care was to be given outside their presence. *Id.* ¶ 12. The staff complied. *Id.* ¶ 13.

There were seventy-one residents at the Columbus facility; by 8:30 p.m. the sur-

veyors had completed assessments of only fourteen individuals. *Id.* ¶ 14. On several occasions the staff asked the surveyors to be allowed to care for the residents. *Id.* ¶ 15. The surveyors allowed the staff to resume their normal routine around 8:30 p.m. *Id.* Once Hash and Sullivan allowed the staff to resume their routine, staying one step of ahead of the Columbus facility staff, the surveyors proceeded to do an incontinence check and found residents who were wet. *Id.*

The staff did not put the last resident to bed until 11:15 p.m. Bradburn Decl. ¶ 391.

According to Scott, a supervisor for ISDH over the area that included Bluffton at the time, surveyors do not have the authority to alter the operation of a facility. *Id.* ¶ 392; Pl.'s Exh. 79, at 49. *See also* Pl.'s Exh. 35, at 37.

The Columbus survey continued for sixteen days, including weekends. Bradburn Decl. ¶ 394. On May 28, 1997, Hash indicated that there might be some substandard quality of care, SSQC, allegations. Springer Decl. 3, ¶ 17. This was a surprise to Legacy. *Id.* At the final exit on May 29, 1997, the survey team stated that on May 15, 1997, they had declared jeopardy in tag F353 for insufficient staffing because so many residents had been wet on that day. *Id.* ¶ 18. This was the first time that Legacy knew jeopardy had been declared. Bradburn Decl. ¶ 395. According to several ISDH employees, including Scott and Reynolds, once ISDH decides to declare jeopardy, the facility is told so it has the opportunity to convince ISDH that the situation can be remedied. Pl.'s Exh. 79, at 47; Pl.'s Exh. 80, at 18.

On May 30, 1997, Hiatt, the ISDH monitor used at Bluffton and Seymour, entered the Columbus facility. Springer Decl. 3, ¶ 19; Bradburn Decl. ¶ 402. Apparently,

---

**8.** Regarding this incident see also Pl.'s Exh. 163.

Hiatt had a copy of the survey report from the May 29, 1997, survey, however refused to release it to Columbus or Legacy until the company signed her contract and acknowledged the ISDH Emergency Order, signed by Coleman on behalf of Hornstein. Springer Decl. 3, ¶ 19; Pl.'s Exh. 164. Legacy refused to sign or acknowledge the order. Springer Decl. 3, ¶ 19. According to ISDH's Reynolds, if immediate jeopardy is called, the report should be in the hands of the facility within two days of the exit. Pl.'s Exh. 81. *See also* Hornstein May 31, 2006, Dep. at 87 (describing the way in which survey findings are communicated to the provider).

After Hiatt left, the Director of Nursing ("DON") at the facility found documents Hiatt left in the conference room. Springer Decl. 3, ¶ 20. The DON called Springer and told Springer that she had found Hiatt's notes, and the documents Hiatt had faxed to Springer, and some sealed envelopes addressed to Hiatt. *Id.;* Pl.'s Exh. 164 (documents faxed by Hiatt to Springer). Springer told the DON to return the items, unopened, to the surveyor still at the facility, Camp. Springer Decl. 3, ¶ 20.

Springer attempted to contact Spain at HCFA on May 30, however, he was unavailable. *Id.* ¶ 22. Springer faxed a letter to Spain regarding the situation on Monday, June 2, 1997. *Id.* On the same day, Banks entered the Columbus facility with an "Amended Order for Placement of a Monitor and Banning Admissions," signed by Hornstein. *Id.* ¶ 24; Bradburn Decl. ¶ 414. Banks asked Springer if she intended to sign it; to which Springer replied she would not. Springer Decl. 3, ¶ 24. Banks documented this on the bottom of the Order and gave Springer a copy. *Id.;* Pl.'s Exh. 166.

Camp delivered to Legacy a copy of the survey report on June 3, 1997. Springer Decl. 3, ¶ 25. The report was 153 pages long. *Id.* ¶ 26. According to Springer, to find jeopardy, the survey team had taken individual allegations that were not jeopardy and lumped them into other allegations by reference such that other allegations reached the level of jeopardy. *Id.* ¶ 27. In addition, individual allegations were repeated numerous times, another way to pyramid, or improperly duplicate, the allegations. *Id. See also id.* ¶¶ 30–32 (describing the allegations and Legacy's response); Pl.'s Exh. 162 (describing the duplicate entries in the survey report). Despite being in the facility for sixteen days, the only day upon which the survey team found a problem with residents being wet was on May 15, 1997. Springer Decl. 3, ¶ 34.

On June 9, 1997, Legacy filed suit in Bartholomew County Superior Court No. 1, Cause No. 03D01–9706–CP–545, alleging inappropriate behavior by ISDH. Bradburn Decl. ¶ 415. When Legacy's counsel did a review of the Bartholomew County docket that day, he discovered that a preemptive action had been filed against Legacy on June 6, 1997, Cause No. 03C01–9706–CP–917. *Id.* ¶ 416. Among various other documents, was a Memorandum in Support of Motion for Temporary Restraining Order and Preliminary Injunction Without Notice. *Id.* A hearing on the temporary restraining order was scheduled for June 10, 1997, at 9:00 a.m. *Id.* Legacy had never received notice of the suit. *Id.* ¶ 418. The documents filed in ISDH's case repeated the allegations in the May 29, 1997, survey report. *Id.* ¶ 420. Mason had filed the suit; Hornstein had verified the accuracy of the allegations. *Id.*

The Bartholomew court refused to extend the date for the temporary injunction hearing. *Id.* ¶ 423. Mason refused to agree to an extension. *Id.* Without time to review the allegations in the May 29, 1997, survey report, Legacy did not have the documentary support to refute ISDH's al-

legations at the June 10, 1997, hearing. *Id.* ¶¶ 424–26. The Bartholomew court adopted the State's proposed Findings of Fact and Conclusions of Law and granted its Motion for Preliminary Injunction and Temporary Restraining Order on June 16, 1997. *Id.* ¶¶ 427, 433. However, the judge clearly stated that he was determining the ultimate merits of the case. *Id.* ¶ 433.

On June 17, 1997, the State issued a press release about the matter. Pl.'s Exh. 86. The press release repeated all of the allegations that Legacy disputed. *Id.*

Meanwhile, Springer prepared the Columbus facility's PoC and sent a copy to both ISDH and Spain at HCFA. Springer Decl. 3, ¶ 29. On June 25, 1997, almost a week after Springer submitted the PoC, Banks sent a letter to Columbus stating that the PoC was not accepted and asking 435 questions. *Id.* ¶ 35. Because of the repetitive nature of the survey report, Springer actually answered sixty-seven questions and answered the remainder with "refer to" citations. *Id.* On June 26, 1997, Springer submitted the PoC addendum to Banks and Spain. *Id.*

Springer reports that when Banks received the addendum, Banks called Springer and "basically chewed [her] out." *Id.* ¶ 36. "In essence, [Banks] said that [Springer] had to admit to the deficient practice and describe how the practice was fixed." *Id.* In addition, Banks forbid Springer to answer any questions with "refer to" citations. *Id.* Banks mentioned to Springer that the facility "was already past [its] window for a PSR and that if it were not for Spain, [it] would be decertified now." *Id.* Springer declares that "[Banks] threatened that if [Springer] did not obey, even Spain could not save the facility." *Id.* Banks followed up her phone call with a letter in which she asked for answers to 357 additional questions requiring a separate answer for each allegation. *Id.* ¶ 37.

On June 27, 1997, Springer sent the second PoC addendum to Banks and Spain. *Id.* ¶ 38.

On June 30, 1997, ISDH initiated the PSR. *Id.* ¶ 39. The survey team consisted of Hash, Stewart and Banks. *Id.* In addition, on June 30, 1997, the monitor said that she would be moving into the conference room with the surveyors. *Id.* ¶ 43. Although Springer had seen monitors who assisted and assumed the duties of a surveyor in the past, Springer thought this activity was improper. *Id.*

After dispatching the administrator,[9] the surveyors began focusing on the care to the hospice residents. *Id.* ¶ 45. They demanded to do a complete head to toe skin assessment of those residents. *Id.* They started with resident Woody Beaureguard. *Id.* That morning, there was no question that Mr. Beaureguard was dying; the staff had called in his family and they were with Mr. Beaureguard on death watch. *Id.* However, Banks ordered the family out of his room and demanded that the staff remove all of Mr. Beauregard's dressings. *Id.* Because of his poor health, Mr. Beaureguard's skin condition was very bad. *Id.* He had approximately nine dressing that took an hour to remove, assess the skin and reapply the dressings. *Id.* When the surveyors were finished, they allowed the family back in the room. *Id.* ¶ 46. Shortly after the family returned to the room, Mr. Beaureguard died. *Id.*

The family asked to speak with Springer. *Id.* ¶ 47. They were very upset and

---

9. Springer alleges that the administrator at the facility, Faulkner, left the building shortly after meeting with the surveyors. Springer Decl. 3, ¶¶ 41–42. All other allegations regarding the incident are inadmissible because they are hearsay or are conclusory and without other documentary support in the record.

asked why the facility had allowed the ISDH to treat Mr. Beauregard and themselves that way. *Id.* The family asked Springer who to talk with to address their concerns; Springer sent them to Banks. *Id.* At 11:55 a.m., the family let Banks and Stewart know how they felt. *Id.* ¶ 48.

The survey concluded on July 3. *Id.* ¶ 39. The surveyors were very vague at the final exit conference, stating that they had not yet decided whether or not they were going to declare jeopardy. *Id.*

Legacy received the survey report on July 16, 1997. *Id.* The survey was only ten pages long with the most severe allegation a "D." *Id.* The only substandard allegations were in documentation; there were no staffing or care-related allegations. *Id.* ¶ 40.

On August 11, 1997, Legacy filed its first set of interrogatories and document requests in the Bartholomew case. Bradburn Decl. ¶ 435.

On August 18, 1997, ISDH concluded the next PSR at the Columbus facility and found the facility in substantial compliance. *Id.* ¶ 453.

A month later, and before it answered the discovery requests in the Bartholomew case, on September 16, 1997, ISDH filed a motion to dismiss the case, Cause No. 03C01–9706–CP–917, "based on the fact that Legacy Health Care, Inc. d/b/a Community Care Center of Columbus has achieved substantial compliance with ISDH's rules and regulations, thereby negating the need to proceed forward. . . ." Pl.'s Exh. 82. *See also* Bradburn Decl. ¶ 436. Legacy objected to the motion to dismiss arguing that it had never changed its operations between the time ISDH filed suit and the time it dismissed the suit, therefore, it would be prejudiced without language that clarified this fact. Bradburn Decl. ¶ 438. On October 15, 1997, the Bartholomew court granted the State's motion to dismiss without referencing any

language about the state of Legacy's operations. Pl.'s Exh. 83.

The next annual survey took place on September 22, 1997. Bradburn Decl. ¶ 453. That survey was only seven pages long, with three minor "D" level allegations of noncompliance. *Id.*

Bradburn contends that the damage had been done because of the negative press generated by the false allegations. *Id.* ¶¶ 443–44.

The administrative proceeding initiated by ISDH during the May 1997 survey, Cause No. C 543–97, was open until May 8, 1998, when the ALJ dismissed it. *Id.* ¶ 446; Pl.'s Exh. 87.

### I. 1998 & 1999 NEW HORIZON DECERTIFICATION PROCEEDINGS

Apparently based on a survey by ISDH at Legacy's New Horizon facility that ended on January 8, 1998, on February 20, 1998, Legacy received two letters from ISDH. Bradburn Decl. ¶ 491. Both letters were dated February 13, 1998, and signed by Reynolds. *Id.*; Pl.'s Exh. 92; Pl.'s Exh. 93. In one letter, ISDH stated that based on a follow-up survey completed on January 5–8, 1998, the New Horizon facility "met the Conditions of Participation as an Intermediate Care Facility for the Mentally Retarded under Title XIX of the Social Security Act. Therefore, the 90 day termination action is rescinded." Pl.'s Exh. 92.

In the other letter, citing the second revisit at the New Horizon facility, which was performed on January 5–8, 1998, pursuant to the Recertification and Licensure survey on September 22, 1997, to October 10, 1997, the facility was found to have a "Standard(s) of Participation . . . out of compliance. . . ." Pl.'s Exh. 93. Based on this finding, "an automatic cancellation

date of April 9, 1998[,] was set." *Id.* Unless the deficiency was corrected before the cancellation date, the agency would cancel the facility's certification. *Id.*

On April 8, 1998, McGee from ISDH hand delivered to Legacy an "Order to Cancel Certification." Bradburn Decl. ¶ 492; Pl.'s Exh. 94. Legacy appealed the action and the administrative appeal was assigned Cause No. M–162–98.[10] Bradburn Decl. ¶ 492. According to Bradburn, "[t]he issue of whether the ISDH could cancel certification with only a standard of participation out of compliance was the forgotten aspect of that proceeding." *Id.* ¶ 493. On September 27, 1998, the ALJ in the case issued her Findings of Fact and Conclusions of Law in which she found that ISDH did not have the allegations to support a recommended termination of the certification at New Horizon. Pl.'s Exh. 95. Apparently, Legacy had provided documents and argument to support the ALJ's finding in this regard. Bradburn Decl. ¶¶ 498–511; Pl.'s Exhs. 36, 97–99.

ISDH appealed the ALJ's order; the appeal was assigned Cause No. AP–M–162–98. Bradburn Decl. ¶ 494. On June 30, 1999, the Appeals Panel issued its "Final Order." *Id.;* Pl.'s Exh. 96. The Appeals Panel found that ISDH did

> not have the authority to cancel Medicaid certification . . . but may only recommend as the power to cancel rests with FSSA, and . . .
>
> That the record failed to support Conclusion of Law # 29 which reads:
>
> "29. In this case, [ISDH] does not have grounds to make a recommenda-

tion that FSSA terminate New Horizon's Medicaid participation."

> That this matter be remanded to [the ALJ] for the purpose of further proceedings to determine whether there is a sufficient basis to support a recommendation of termination.

Pl.'s Exh. 96.

At this point in time, ISDH and FSSA revised their interagency agreement to clarify that ISDH had the authority to make certification decisions. Mason Decl. ¶ 14.

Bradburn contends, without evidentiary support, that at least eight other facilities remained certified with standards of participation out of compliance. Bradburn Decl. ¶ 513.

Apparently, ISDH made another decertification attempt on New Horizon in 1999 that resulted in litigation, Cause No. C–578–99, Cause No. AEO–24–99 and Cause No. M–171–99.[11] Bradburn Decl. ¶ 535. According to ISDH documentation, on April 23, 1999, ISDH completed a certification survey at New Horizon. Defs.' Exh. 29, at 7. This survey cited fourteen deficiencies, including problems with staff training, active treatment, individual program planning and implementation, and nursing services. *Id.* These were standard level deficiencies. *Compare id. with* 42 C.F.R. § 442.105. In a PCR follow-up survey on June 3, 1999, ISDH cited a deficiency in program implementation. Defs.' Exh. 29, at 7.

In a complaint investigation on July 21, 1999, ISDH surveyors cited five deficien-

---

**10.** Part of this proceeding was brought to this Court in February 2000, when Legacy sought an injunction of the interruption of Medicaid funding to New Horizon. Bradburn Decl. ¶ 492. Bradburn contends that the issue in that proceeding was whether ISDH had the authority to terminate or merely recommend termination of Medicaid participation. *Id.*

**11.** The Court notes that pursuant to the Court's earlier ruling on Defendants' evidentiary objections, significant portions of Bradburn's declaration were not considered regarding ISDH's decertification action against New Horizon in 1999.

cies, including staff treatment of residents. *Id.* at 6. Immediate jeopardy was identified by the survey team, affirmed by the immediate jeopardy team, and approved by Hornstein. Hornstein Decl. ¶ 38; McGee Decl. ¶ 17. On that same date, ISDH issued an Emergency Order for Placement of Monitor at New Horizon. Defs.' Exh. 30. Also on July 21, 1999, ISDH gave New Horizon notice that its certification for participation in Medicaid was ordered terminated effective August 13, 1999. Defs.' Exh. 31; Defs.' Exh. 32. Legacy requested review of the Emergency Order in Cause No. AEO–24–99 and a hearing was held August 3–5, 1999. Defs.' Exh. 30.

During the hearing, Bonnie Chilton ("Chilton"), a Bureau of Developmental Disability Services ("DDARS") coordinator assigned to New Horizon, testified that three or four months prior to the hearing, she received a call from McGee at ISDH during which McGee seemed very upset. Pl.'s Exh. 105, at 1, 25–31. McGee asked Chilton if McGee was placing people at New Horizon, to which Chilton replied she was. *Id.* at 30. McGee then said, "What do you mean by doing that?" *Id.* To which Chilton replied that she had not been told to do otherwise. *Id.*

In a subsequent conference call, Chilton testified that McGee reported she was concerned about reports she was getting from her surveyors at New Horizon, specifically that "the surveyors had said that there were people who were lying in their own body waste, there was not enough staff to take care of all the people, people had fallen out of beds, there were unexplained bruises on the people." *Id.* at 26. McGee stated "something to the effect that if New Horizon spent more money on staff than litigation maybe they would be in better condition or shape, or something to that effect." *Id.* at 32. McGee denies making any such statement. Defs.' Exh. 46, at

301. In her declaration, McGee states that she does not recall talking with Chilton or making such a comment. McGee Decl. ¶ 12. She also declares that she did not know New Horizon was a Legacy facility until the litigation began in July 1999. *Id.* However, there is in evidence a letter addressed to McGee dated March 10, 1997, on "Community Care Centers, A Legacy Healthcare, Inc. Operation" letterhead regarding New Horizon Developmental Center that was received by ISDH on March 11, 1997. Pl.'s Exh. 106. There is a handwritten notation dated March 21, 1997, in the upper right-hand corner with "Clara McGee" underneath the notation. *Id.*

Stark also testified at this hearing. Defs.' Exh. 6. He said he was not involved with the New Horizon survey from July 12 through 21, but his program director asked him to go to the facility on Sunday, July 18, to look at the conditions, the environment, the clients, and assess whether their needs were being met. *Id.* at 274. He testified: "When I'm out in the field and I have an issue that I feel is a potential serious and immediate, I call the State Department of Health and I inform them of the issue and the team—we meet as a team collectively—and decide that it's a potential serious and immediate or possible serious and immediate, and at this time it is a concern, it's an issue." *Id.* at 285. McGee was Stark's program director at the time. *Id.* at 156–57.

Stark also testified that he went to New Horizon again on August 2, 1999, because McGee told him to go in and make general observations. *Id.* at 146. All told, Stark was at New Horizon on Sunday, July 18, Friday, July 30, Sunday, August 1, and Monday, August 2, 1999. *Id.* at 147. He was asked to go because New Horizon had refused to let the appointed monitor enter the facility. *Id.* at 154. Stark was not a

monitor, rather he was an investigator. *Id.* at 157, 171.

Based on the record at the hearing, in Cause No. AEO–24–99, ALJ Christen, entered a Recommended Order that found the citizens at New Horizon were faced with immediate jeopardy at the time of the July 21, 1999, survey, and ordered the placement of a monitor at the facility. Defs.' Exh. 30. The Order found that at least two residents were harmed or injured without any apparent intervention by staff members and that the facility was understaffed by at least 20%. *Id.*

On August 27, 1999, ALJ Christen entered an order that granted Legacy's Petition to Remove Monitor, based on his own personal visit to New Horizon and reliance on unsworn statements made by Legacy personnel during the site visit. Defs.' Exh. 30; Mason Decl. ¶ 15.

ISDH filed a request that ALJ Christen recuse himself from that administrative proceedings, which the ALJ denied on September 8, 1999. Mason Decl. ¶ 15; Defs.' Exh. 30. ISDH appealed, and on January 5, 2000, an Appeals Panel entered a Final Order that reversed the ALJ's September 8, 1999, Order and disqualified him from adjudicating any proceedings in Cause Nos. AEO–24–99 and M–171–99 (Medicaid decertification proceeding), and C–597–99 and CC–304–99. Defs.' Exh. 30.

After the Appeals Panel announced its decision, ISDH moved for ALJ Christen to recuse himself in all pending matters related to New Horizon. Mason Decl. ¶ 6. The ALJ refused; ISDH appealed, and the Appeals Panel reversed the ALJ's decision ordering ALJ Christen to be recused from all New Horizon matters. *Id.*; Defs.' Exh. 33.

On January 21, 2000, Legacy appealed this Final Order by filing suit in Marion Superior Court, Cause No. 49D01–0001–MI–94. Defs.' Exh. 34. On October 30, 2000, the court dismissed the petition be-cause Legacy had not filed the agency record. Defs.' Exhs. 34 & 35.

As referred to above, Legacy had also requested administrative review of the July 21, 1999, Notice of Medicaid Decertification, Cause No. M–171–99. Defs.' Exh. 32. On August 23, 1999, ALJ Christen entered a Recommended Order that dismissed the July 21, 1999, decertification notice because he found it contrary to the Appeals Panel ruling in AP–M–162–98 that ISDH only had the power to recommend decertification and only FSSA had the authority to decertify. *Id.*

On February 1, 2000, the Appeals Panel issued a Final Order that reverse that decision. *Id.* The Appeals Panel ruled that ISDH did have authority to decertify healthcare facilities from the Medicaid program and impose appropriate remedies. *Id.*

Legacy appealed that Final Order and ultimately, in *Indiana State Department of Health v. Legacy Healthcare, Inc.,* 752 N.E.2d 185 (Ind.Ct.App.2001), *reh'g denied,* the Indiana Court of Appeals affirmed the Appeals Panel. *Id.* at 187–92.

ISDH conducted a multiple PCR follow-up survey at New Horizon on September 2, 1999. Defs.' Exh. 29, at 5. This survey cited six deficiencies, including staff treatment of residents, direct care, active treatment, and program implementation. *Id.* On September 2, 1999, ISDH sent a letter to New Horizon with its findings that the facility was out of compliance with conditions of participation in the Medicaid program because its quality of care to residents was deficient. Defs.' Exh. 31. The letter stated that ISDH would recommend that OMPP terminate New Horizon's provider agreement. *Id.* In addition, the letter informed New Horizon that once the certification was cancelled, it could reapply for participation under the federal rules. *Id.* The letter also notified New Horizon

that ISDH's findings constituted an appealable order under Indiana Code § 4-21.5-1-9, and outlined the procedure for filing an appeal with ISDH. *Id.* Any appeal would be due by September 19, 1999. *Id.*

Legacy did not appeal ISDH's September 2, 1999, decision that cancelled New Horizon's Medicaid certification. Hornstein Decl. ¶ 39.

On September 9, 1999, OMPP sent a letter to New Horizon informing it that based on ISDH's findings, New Horizon's participation as a Medicaid provider was terminated effective September 1, 1999. Defs.' Exh. 36. The letter also informed New Horizon how it could regain certification. *Id.* Further, the letter informed gave Legacy information on how it could file a petition for review of OMPP's action. *Id.*

Legacy appealed the September 9, 1999, OMPP decision through FSSA's administrative process. Defs.' Exh. 37. On August 21, 2000, the ALJ entered an Order granting the State's Motion for Summary Judgment. *Id.* The Order denied Legacy's appeal of the decision to terminate New Horizon's Medicaid provider agreement because Legacy "waived its right to appeal the ISDH survey and certification findings by choosing not to file a petition for administrative review with ISDH by September 19." *Id.*

On December 22, 2000, FSSA issued a Notice of Final Agency Action that affirmed the ALJ's August 21, 2000, decision. Defs.' Exh. 38. Legacy filed a petition for judicial review of this order in Hamilton Superior Court, Cause No. 29D01-0003-CP-180. Defs.' Exh. 39. On August 9, 2004, the Hamilton Superior Court entered Findings of Fact, Conclusions of Law, and Order adverse to FSSA. *Id.*

Meanwhile, Legacy filed the instant law suit on February 18, 2000, and asked this Court for a preliminary injunction that would require FSSA to continue Medicaid funding at New Horizon and to provide an administrative hearing on the ISDH survey findings noted in the agency's September 2, 1999, decertification letter. After oral argument on the preliminary injunction matter, this Court issued a ruling on March 3, 2000, that denied Legacy's request because it had not shown a reasonable likelihood of success on the merits. Defs.' Exh. 35. On March 8, 2000, this Court denied Legacy's Emergency Motion for Grant of Injunction Pending Appeal. Defs.' Exh. 41. In an unpublished opinion dated March 28, 2001, the Seventh Circuit Court of Appeals affirmed. *Legacy Healthcare v. Feldman,* No. 00-1615. Defs.' Exh. 42.

Also in the mean time, ISDH completed a complaint survey at New Horizon on October 15, 1999. Defs.' Exh. 29, at 4. This survey cited seven deficiencies including staff treatment of residents, direct care, program implementation, and nursing services, which resulted in a finding of immediate jeopardy. *Id.* That same day, ISDH issued an Emergency Order for Placement of a Monitor at New Horizon, and issued an Order Recommending Termination of Medicaid Provider Agreement, which were assigned Cause Nos. AEO-28-99 and M-175-99. Defs.' Exh. 33. ISDH also filed a second licensure action, C-606-99. *Id.* A hearing was conducted on the Emergency Order, Cause No. AEO-28-99, and on January 6, 2000, ALJ Christen voided the Emergency Order, Cause No. AEO-28-99, and voided termination of New Horizon's certification, Cause No. M-175-99. *Id.* The ALJ found that Stark had failed fully to investigate the problems with the resident who was the subject of the jeopardy charge. *Id.* Apparently, ISDH appealed.

On June 18, 2000, the Appeals Panel issued a Final Order that applied to Cause Nos. AEO28-99, M-175-99, and C-606-99.

Defs.' Exh. 33. The Appeals Panel reversed ALJ Christen's January 6, 2000, order because he had been disqualified from other New Horizon appeals and the appearance of bias or prejudice extended to these proceedings. *Id.* Legacy appealed to Hamilton Superior Court, Cause No. 29D03–0008–CP–581. Defs.' Exh. 64. On October 13, 2000, the court dismissed the case; Legacy appealed; on March 2, 2001, the Indiana Court of Appeals dismissed the appeal because Legacy had failed to file the record of proceedings. Defs.' Exh. 65.

Also in 1999, on December 10, 1999, ISDH conducted another complaint survey at New Horizon. Defs.' Exh. 29, at 2. The survey cited eighteen deficiencies, including staff treatment of residents, staff training program, active treatment, program implementation, program monitoring, management of inappropriate behavior, physician services, nursing services, infection control, and mean services. *Id.* Based on this survey, a third licensure action was filed on January 10, 2000, and ISDH filed an Emergency Order for Placement of a Monitor on January 11, 2000, assigned Cause Nos. C–618–00 and AEO–33–00, respectively.

These causes, along with Cause Nos. CC0329–99 and CC–324–99 were assigned to ALJ Rodeheffer. Defs.' Exh. 43. Legacy moved to have her disqualified; ALJ Rodeheffer denied the motion and Legacy appealed. *Id.* On September 13, 2000, the Appeals Panel issued a Final Order that found that ALJ Rodeheffer was not subject to disqualification. *Id.*

Concurrently, on July 23, 1999, Legacy filed with FSSA a Petition for Expedited Review of Ban on Admissions. Defs.' Exh. 44. The petition claimed that the ban had

been imposed on New Horizon as a result of allegations contained in a survey report dated July 21, 1999, and referred to in ISDH's July 21, 1999, Emergency Order for Placement of Monitor and Order to Terminate Certification. *Id.*

An FSSA ALJ dismissed Legacy's appeal because 1) Division of Disability, Aging and Rehabilitative Services ("DDARS") had no duty or obligation to New Horizon to place individuals at the facility, therefore, Legacy failed to state a claim for relief; and 2) Legacy lacked standing to assert the rights of individuals who might have been in the process of being admitted to New Horizon at the time of the ban. *Id.* DDARS is the unit within FSSA that controls the institutional placement of mentally retarded and developmentally disabled individuals. *Id.*

On March 8, 2000, the final reviewing authority for DDARS, Debra Wilson ("Wilson"), affirmed the ALJ. *Id.* The March 8, 2000, ruling, a letter, provided Legacy with information on how to petition for judicial review of the agency's decision. *Id.* Legacy filed no appeal. *Id.*

Legacy did try to challenge the DDARS ban at the August 3–5, 1999, hearing when it questioned Chilton about her interactions with McGee. Defs.' Exh. 45 at 9, 26–29.

Eventually, upon petition for appointment of receiver, on November 3, 2000, the Hamilton Superior Court No. 3, appointed a receiver for the New Horizon facility. Defs.' Exh. 47.

## J. OTHER EVIDENCE

Legacy found a handwritten note stuck between the pages of a QR draft of a survey at North Vernon. Bradburn Decl. ¶ 617. The note reads, in part:

Add—

Docum of instances
where fac was given opportunity to
correct & didn't work.

Exiting
today

*Beef
up—
more obvious

353– more immediate
potential
314—H
319—H
327—H
316– H - move to H

doesn't
have to be
imm. jeopardy

occurring because of
lack of staffing

Pl.'s Exh. 122. An e-mail from Reynolds to Donna Downs ("Downs"), a QR surveyor, written on September 11, 1996, which Bradburn asserts was written around the same time as the note, states:

> Per our discussion, we'll expect the IJ tags to be supplemented with examples of opportunities the facility had to correct the problem, but missed their chances in order to explain the length of time the survey took. We will also expect F353 to include reference to some of the tags at the GHI (harm, not yet IJ) to show the potential for increasing existing problems due to lack of staffing. The GHI tags need not be elevated to the JKL severity to be included in F353 at an L since they are used to document potential that is not yet IJ.

Pl.'s Exh. 123.

## IV. *SUMMARY JUDGMENT STANDARD*

As stated by the Supreme Court, summary judgment is not a disfavored procedural shortcut, but rather is an integral part of the federal rules as a whole, which are designed to secure the just, speedy, and inexpensive determination of every action. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). *See also United Ass'n of Black Landscapers v. City of Milwaukee,* 916 F.2d 1261, 1267–68 (7th Cir.1990). Motions for summary judgment are governed by Federal Rule of Civil Procedure 56(c) ("Rule 56(c)"), which provides in relevant part:

> The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Once a party has made a properly-supported motion for summary judgment, the opposing party may not simply rest upon the pleadings but must instead submit evidentiary materials which "set forth specific facts showing that there is a genuine issue for trial." FED.R.CIV.P. 56(e). A genuine issue of material fact exists whenever "there is sufficient evidence favoring the nonmoving party for a jury to return a

verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party bears the burden of demonstrating that such a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Oliver v. Oshkosh Truck Corp.*, 96 F.3d 992, 997 (7th Cir.1996). It is not the duty of the Court to scour the record in search of evidence to defeat a motion for summary judgment; rather, the nonmoving party bears the responsibility of identifying the evidence upon which it relies. *See Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir.1996). When the moving party has met the standard of Rule 56, summary judgment is mandatory. *See Celotex*, 477 U.S. at 322–23, 106 S.Ct. 2548; *Shields Enters., Inc. v. First Chi. Corp.*, 975 F.2d 1290, 1294 (7th Cir.1992).

In evaluating a motion for summary judgment, the Court should draw all reasonable inferences from undisputed facts in favor of the nonmoving party and should view the disputed evidence in the light most favorable to the nonmoving party. *See Estate of Cole v. Fromm*, 94 F.3d 254, 257 (7th Cir.1996). The mere existence of a factual dispute, by itself, is not sufficient to bar summary judgment. Only factual disputes that might affect the outcome of the suit in light of the substantive law will preclude summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505; *JPM Inc. v. John Deere Indus. Equip. Co.*, 94 F.3d 270, 273 (7th Cir.1996). Irrelevant or unnecessary facts do not deter summary judgment, even when in dispute. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir.1992). "If the nonmoving party fails to establish the existence of an element essential to [its] case, one on which [it] would bear the burden of proof at trial, summary judgment must be granted to the moving party." *Ortiz v. John O. Butler Co.*, 94 F.3d 1121, 1124 (7th Cir.1996).

## V. DISCUSSION

Briefly, Legacy alleges that Defendants retaliated against it for exercise of its First Amendment right to litigate issues affecting its business against the State of Indiana, and conspired to do so. Specifically, that after the litigation activity during the period from the late 1980s through 1996, Defendants unfairly targeted Legacy's facilities for decertification and/or license revocation proceedings. Similarly, Legacy alleges that Defendants systematically denied Legacy equal protection under federal and State laws, regulations and/or guidelines, and conspired to do so.

In their Motion for Summary Judgment, Defendants contend that summary judgment in their favor is appropriate on these claims, in part, by operation of the appropriate statute of limitations. On certain of the remainder of the allegations, Defendants contend that summary judgment in their favor is appropriate because the issues raised therein either were or could have been raised in administrative or other proceedings between the parties, and were decided against Legacy. Defendants also contend that on any remaining claims, Legacy has failed to evidence a material issue of fact on the merits. Finally, Defendants contend that all of them are either absolutely or qualifiedly immune from Legacy's claims. The Court addresses each of Defendants' arguments in turn.

### A. STATUTE OF LIMITATIONS

Defendants contend that a two-year statute of limitations applies to Legacy's claims under § 1983, therefore, because Legacy filed this suit on February 18, 2000, all claims arising out of actions that occurred prior to February 18, 1998, are time-barred.

Legacy does not dispute that a two-year statute of limitations applies to its claims. It does, however, contend that the limitations period does not extend to acts prior to the limitations period that show Defendants' express or implied agreement to deprive Legacy of its rights, rather, it extends only to bar recovery for overt acts in furtherance of the agreement beyond two years prior to filing. Pl.'s Br. in Opp'n at 27–28 (quoting *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.1988)). In other words, evidence prior to February 18, 1998, is relevant to show motivation or agreement, even if Legacy cannot recover for any harm alleged. Further, Legacy argues that evidence of overt acts outside the statute of limitations are not barred necessarily because " 'the wrongful acts, themselves, are of a continuing nature.' " *Id.* at 28 (quoting *Scherer*, 840 F.2d at 440).

■■■ The Court agrees with the parties that a two-year statute of limitations applies to Legacy's § 1983 claims. The statute of limitations for civil rights claims brought pursuant to 42 U.S.C. § 1983 is determined by the personal injury law of the state in which the violation took place. *Hoagland v. Town of Clear Lake*, 415 F.3d 693, 699–700 (7th Cir.2005) (citing *Wilson v. Garcia*, 471 U.S. 261, 105 S.Ct. 1938, 85 L.Ed.2d 254 (1985)). Indiana's statute of limitations for personal injury claims is two years. Ind.Code § 34–11–2–4; *Hoagland*, 415 F.3d at 700. Applying this statute to the case at bar, Legacy may not recover for injury that occurred prior to February 18, 1998, because such injury is outside the two-year statute of limitations. However, evidence of conduct or interactions between the parties, or between Defendants, prior to that date may be relevant to show motive, agreement or knowledge. *See Cooper v. Parsky*, 140 F.3d 433, 441 (2d Cir.1998) (stating that "although plaintiffs may not recover for conduct that occurred prior to the limita-

tions period, evidence of such conduct may be admissible to shed light on the motives with which acts within the limitations period were performed"); *see also Agushi v. Duerr*, 196 F.3d 754, 761 (1999) (discussing operation of Federal Rule of Evidence 404(b) and finding that evidence of other wrongs is admissible to prove motive, opportunity, intent, preparation or plan); *Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir.) (holding that the statute of limitations on a civil conspiracy acts to bar recovery for overt acts committed outside the statute of limitations, but evidence of the agreement outside the limitations period is permissible), *cert. denied* 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

Legacy relies on *Scherer* for the proposition that it may recover under its conspiracy theories for injury incurred by acts outside the limitations period because of the continuing nature of the acts of the conspiracy. The Court agrees with Defendants, however, that *Scherer* does not allow for such recovery. Rather, the *Scherer* court agreed with the majority of Circuit Courts that a plaintiff may only recover for overt acts within the period of limitations. 840 F.2d at 439–40. The *Scherer* court discussed the holding in *Baker v. F & F Investments*, 420 F.2d 1191 (7th Cir.), *cert. denied* 400 U.S. 821, 91 S.Ct. 42, 27 L.Ed.2d 49 (1970). In that case, the Seventh Circuit allowed recovery for injury that occurred within the limitations period that resulted from a pre-limitations overt act that was repeated during the limitations period. *Baker*, 420 F.2d at 1200. In *Baker* the subject matter was a series of continuous contracts between the parties. *Id.* at 1193, 1200. The *Baker* court concluded that the District Court's application of the statute of limitations to the end date of each contract was proper. *Id.* at 1200. The *Scherer* court, in its discussion of *Baker*, concluded that its

holding was consistent with that in *Baker* because the limitations period in *Baker* was still applied to the end date of each contract, thus ensuring that only the non-stale claims were recompensed. *Scherer,* 840 F.2d at 440.

Under *Scherer* then, Legacy may not recover for pre-limitation period injury because they are part of a continuous violation. Legacy may only recover for injury within the limitations period because of overt acts committed within that period.

In summary, Legacy may not recover for allegedly wrongful acts that occurred prior to February 18, 1998, however, evidence of allegedly wrongful acts prior to that date are admissible to prove motive, agreement or knowledge of Defendants of allegedly wrongful acts committed within the limitations period. Therefore, Legacy may not recover for the following allegedly wrongful acts: all conduct discussed in Section III.C.; alleged withholding of a license at North Vernon in 1996 and 1997, *see infra* Section III.E.1.; the allegedly wrongful cycle-breaking issues at Portland East in 1996–1997, and that in 1997–1998, *see infra* Sections III.G.2.a. & b.; the allegedly wrongful cycle-breaking issues at New Castle prior to February 1998, *see infra* Section III.G.2.d.; the allegedly wrongful license revocation proceeding at Seymour in 1997, *see infra* Section H.1.; the allegedly wrongful license revocation proceeding at Columbus in 1997, *see infra* Section H.2.

## B. *RES JUDICATA* AND/OR COLLATERAL ESTOPPEL

Defendants contend that either *res judicata* or collateral estoppel applies to all of Legacy's claims because they were either the subject of administrative proceedings that were conclusively decided against Legacy, or could have been the subject of administrative proceedings involving Lega-

cy and the State, but Legacy chose not to raise them. Legacy contends that because there is no exhaustion requirement, its claims are not barred by either preclusion doctrine. Moreover, Legacy argues that its claims are not subject to preclusion. Pl.'s Br. in Opp'n at 30 (citing *Beechwood Restorative Care Ctr. v. Leeds,* 317 F.Supp.2d 248, 262–63 (W.D.N.Y.2004), *aff'd in part, vacated in part, and remanded by* 436 F.3d 147 (2d Cir.2006)).

Defendants rely upon the findings derived through administrative proceedings to make their preclusion argument. In a § 1983 case, the Court must give the same preclusive effect to administrative findings as a court in Indiana would do so. *See Goodwin v. Bd. of Trustees of Univ. of Ill.,* 442 F.3d 611, 620 (7th Cir. 2006) (discussing the holding of *University of Tennessee v. Elliott,* 478 U.S. 788, 797– 99, 106 S.Ct. 3220, 92 L.Ed.2d 635 (1986)). In Indiana, there are four elements for determining whether to apply preclusion to an administrative determination:

> (1) the issues sought to be estopped were within the statutory jurisdiction of the agency; (2) the agency was acting in a judicial capacity; (3) both parties had a fair opportunity to litigate the issues; and (4) the decision of the administrative tribunal could be appealed to a judicial tribunal.

*Ind. State Dep't of Health v. Legacy Healthcare, Inc.,* 752 N.E.2d 185, 190–91 (Ind.Ct.App.2001) (citing *Watson Rural Water Co. v. Ind. Cities Water Corp.,* 540 N.E.2d 131, 135 (Ind.Ct.App.1989), trans. denied). Indiana courts have stated that " '[t]he test generally applied when determining whether a suit is barred by claim preclusion is "whether identical evidence will support the issues involved in both actions." ' " d. (quoting *Bojrab v. John Carr Agency,* 597 N.E.2d 376, 378 (Ind.Ct. App.1992) (citation omitted by Legacy

court)). This construct presumes that the parties are identical or in privy, but the Seventh Circuit has ruled that government employees sued in their individual capacity are not generally privies of their government employers. *Beard v. O'Neal,* 728 F.2d 894, 897 (7th Cir.), *cert. denied* 469 U.S. 825, 105 S.Ct. 104, 83 L.Ed.2d 48 (1984). However, such individuals may raise a collateral estoppel argument that would preclude the re-litigation of factual or legal issues that were actually decided in a state administrative proceeding. *Id.* *See also Beechwood Restorative Ctr.,* 436 F.3d at 152 (discussing a similar standard under New York law).

■ Under the circumstances of this case and the standards presented here, this Court concludes that the preclusive effect of the relevant administrative proceedings is not as broad as Defendants assert. Rather, the Court must look to see whether the factual or legal issues presented in this case were actually decided in any administrative proceeding. *See Beard,* 728 F.2d at 897. With respect to Legacy's argument that Defendants retaliated against it for exercising its First Amendment right to litigate in the late 1980s through 1996, by withholding a license at North Vernon, by improperly using survey cycles to raise false decertification proceedings, or by improperly manipulating survey findings to decertify New Horizon, the Court cannot agree with Defendants that those issues were ever before an administrative or other judicial body. Similarly, allegations of unequal treatment not arising out of Defendants' activities at North Vernon were never before an administrative or other judicial body.

To the contrary, Defendants presented evidence, with respect to the North Vernon Medicaid decertification action and the license revocation actions in 1999, that the Appeals Panel adopted the ALJ's finding of fact that ISDH had not "treated [Legacy] unfairly or disparately." Defs.' Exh. 25, at 5. Further, in the same Final Order, the Appeals Panel concluded that Legacy had presented "insufficient evidence to show that North Vernon ha[d] been treated disparately in terms of enforcement actions taken against it as compared to other long-term care facilities." *Id.* at 14–15. Moreover, the evidence Legacy relies upon here to raise the equal protection issue is the same evidence that it presented at the administrative hearings related to these findings. *See, e.g.,* Defs.' Exh. 16, at 151–52; Defs.' Exh. 25; Pl.'s Eh. 118 at 162–64; Pl.'s Exh. 19, at 65–77; Pl.'s Exh. 120; Bradburn Decl. ¶ 610; Pl.'s Exh. 121; Bradburn Decl. ¶¶ 612–13; Pl.'s Exh. 35, at 26–32; Bradburn Decl. ¶¶ 615–16. These issues, then, were conclusively decided against Legacy. In other words, with respect to Legacy's claims that Defendants denied it equal rights under the law in the North Vernon decertification and license revocation actions in 1999, the finding of the Appeals Panel is final on that issue and Legacy may not re-litigate it here.

Defendants also presented evidence that some issues related to decertification and license revocation at New Horizon were before the Appeals Panel, the Marion Superior Court, the Indiana Court of Appeals, this Court and the Seventh Circuit Court of Appeals, and the Hamilton Superior Court. Defs.' Exhs. *See, e.g.,* Pl.'s Exh. 96; Defs.' Exhs. 29–38; Defs.' Exhs. 42–45; Defs.' Exh. 47; Defs.' Exh. 65. It is clear that the Appeals Panel, the Marion Superior Court, the Hamilton Superior Court, and the Indiana Court of Appeals addressed issues related to ISDH's authority to decertify healthcare facilities, in particular from the Medicaid program. *See Indiana State Department of Health v. Legacy Healthcare, Inc.,* 752 N.E.2d 185 (Ind.Ct.App.2001), *reh'g denied;* Pl.'s

Exhs. 95 & 96; Defs.' Exh. 32. It is equally clear that this Court and the Seventh Circuit addressed Legacy's procedural due process rights viz-a-viz decertification at New Horizon. Defs.' Exh. 42. And, the Hamilton Superior Court addressed issues related to receivership at New Horizon. Defs.' Exh. 47. However, Defendants point to no decision or finding of fact in these various proceedings that addresses the issues raised in the instant suit regarding Defendants' alleged use of their administrative power to retaliate against Legacy for litigating various issues or Defendants' alleged use of their administrative power to deny Legacy equal protection.

Therefore, the Court concludes that Legacy's claims that Defendants violated its First Amendment right to litigate by retaliating against it at either, or both, North Vernon and New Horizon, and conspired to do so, are not barred by collateral estoppel; in addition, Legacy's claims that Defendants violated its right to equal protection under the law at New Horizon, and conspired to do so, are not barred by collateral estoppel.

## C. RETALIATION FOR EXERCISE OF FIRST AMENDMENT RIGHTS

Turning now to the merits of Legacy's claim that Defendants retaliated against it for exercising its First Amendment rights, Defendants assert that Legacy has failed to provide any facts alleging retaliatory behavior of Powers, Stark, Ellis or A. Connell, therefore, its claims against those defendants should be dismissed. With respect to the remaining defendants, Defendants contend that Legacy has failed to evidence retaliatory motive. Legacy asserts that its circumstantial evidence strongly supports an inference that Defendants were motivated by retaliatory purpose. Essentially, Legacy contends that during the litigation between Legacy and

FSSA in the period between 1988 and 1996, Davis developed a particular animosity toward Legacy. When Davis attended the interagency meeting on November 6, 1996, with Hornstein, Coleman and Mason from ISDH, Legacy asserts that Davis convinced those individuals to target Legacy facilities. Legacy asserts that the aggressive survey program at its facilities over the next three years is evidence of retaliatory motive, in addition to Hornstein, Coleman and Mason's refusal to allow Legacy to obtain a copy of its license at North Vernon.

 After considering the parties' arguments and evidence, the Court concludes that Legacy has failed to evidence a material issue of fact that Defendants retaliated against it for exercising its First Amendment rights. To evidence a *prima facie* case of retaliation, Legacy "must demonstrate that (1)[its] conduct was constitutionally protected; and (2)[its] conduct was a 'substantial factor' or 'motivating factor' in the [Defendants'] challenged actions." *Abrams v. Walker*, 307 F.3d 650, 654 (2002), *abrogated on other grounds by Spiegla v. Hull*, 371 F.3d 928, 941–43 (7th Cir.2004) (disavowing its prior holdings that evidence of "but-for" causation is required because such a requirement is inconsistent with the Supreme Court's burden-shifting analysis for First Amendment retaliation claims enunciated in *Mount Healthy City School District Board of Education v. Doyle*, 429 U.S. 274, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)). In other words, to show causation, Legacy must show that its protected activity " 'caused, or at least played a substantial part in,' " *Spiegla*, 371 F.3d at 942–43 (quoting *Klunk v. County of St. Joseph*, 170 F.3d 772, 775 (7th Cir.1999)). Legacy may evidence intent or motivation either with direct evidence or circumstantial evidence. *See Village of Arlington Heights v. Metro.*

*Housing Dev. Corp.,* 429 U.S. 252, 266, 97 S.Ct. 555, 50 L.Ed.2d 450 (1977); *Ibarra v. Martin,* 143 F.3d 286, 291 (7th Cir.1998). Here, Legacy relies on circumstantial evidence and the Court is required to draw only reasonable inferences therefrom. *Cf. Little v. Cox's Supermarkets,* 71 F.3d 637, 642–43 (7th Cir.1995) (discussing the proper inferences to be drawn from circumstantial evidence of discriminatory intent and pretext in an Employee Retirement Income Security Act discrimination case, the *prima facie* case for which is drawn from employment discrimination cases). If Legacy succeeds in establishing a *prima facie* case of retaliation, the burden shifts to Defendants to show that they would have taken the same action in the absence of the protected conduct. *Spiegla,* 371 F.3d at 943 (referring to *Mt. Healthy,* 429 U.S. at 287, 97 S.Ct. 568).

■ There is no dispute that Legacy's participation in litigation against the State of Indiana is constitutionally protected speech. *See, e.g., McDonald v. Smith,* 472 U.S. 479, 482, 105 S.Ct. 2787, 86 L.Ed.2d 384 (1985) (stating that the First Amendment's "right to petition is cut from the same cloth as other guarantees of that Amendment, and is an assurance of a particular freedom of expression"); *Calif. Motor Transp. Co. v. Trucking Unltd.,* 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972) (stating that the right to access the courts is one aspect of the right to petition under the First Amendment); *see also Snyder v. Nolen,* 380 F.3d 279, 290 (7th Cir.2004) (discussing limitation on the First Amendment's right to petition for incarcerated individuals). Therefore, Legacy has established the first element of its *prima facie* case.

However, with respect to individual defendants Powers, Stark, Ellis and A. Connell, Legacy provides neither factually-based allegations nor evidence to show that any action they took was motivated by or connected in any way to Legacy's litigation in the late 1980s through 1996 with either FSSA or ISDH. There is no evidence that these defendants participated in any way in the prior litigation nor consulted with any other defendant about Legacy's litigious history before performing their respective duties viz-a-viz Legacy's facilities. Consequently, Legacy has failed to make a *prima facie* case that these individuals violated its First Amendment rights, or conspired to do so, and, for that reason, summary judgment in their favor is appropriate.

With respect to the remaining individuals, Legacy asserts that Davis, Mason, Hornstein and Coleman, attended the November 6, 1996, meeting at which Davis turned the other three Defendants against Legacy. In addition, Legacy contends that there was no legitimate purpose for the meeting, after which ISDH aggressively attacked Legacy facilities through improper extension of complaint cycles; multiple, falsely-based decertification attempts; and multiple, falsely-based licensure actions. These activities, Legacy argues, is circumstantial evidence of retaliatory motive.

The Court cannot agree with Legacy that these activities raise an inference of retaliatory intent. Legacy's own evidence shows that Craig, not any of the Defendants, apparently called the November 6, 1996, meeting because of her concern for the safety of the residents at two of Legacy's facilities. Pl.'s Exh. 172, at 9–10, 19–22, 27–31. In addition, there is uncontroverted evidence that by November 1996 Legacy's North Vernon facility was having difficulties meeting government standards of care. Bradburn Decl. ¶¶ 67, 100, 103–07. Furthermore, Legacy presents no evidence that Coleman, Mason or Hornstein had any negative feelings toward Legacy because of litigation against either FSSA

or ISDH in the years prior to the meeting. Rather, the admissible evidence is that, after November 1996, Mason's only role was as an attorney either for the State or for ISDH; there is no evidence that she told anyone to make false accusations against or to treat Legacy's facilities differently because of her past litigation experience with the company. With respect to Coleman, the only admissible evidence about his activity is that he signed ISDH's interrogatory responses that denied communication between FSSA and ISDH, in error, and that he signed an emergency order on behalf of Hornstein issued on May 30, 1997, at the Columbus facility. Springer Decl. 3, ¶ 19; Pl.'s Exh. 164. This is not enough evidence to raise an inference of retaliatory intent as to Coleman.

There is some evidence that Hornstein stated at a meeting with Legacy in July 1998 that Legacy should concentrate on fixing its facilities rather than challenging ISDH's findings. Bradburn Decl. ¶ 125. In addition, Hornstein was aggressive in her pursuit to revoke North Vernon's license in 1999. Pl.'s Exh. 118, at 162–64. Moreover, there is evidence that she hand wrote some criteria for finding immediate jeopardy, apparently some time in 1999. Pl.'s Exh. 119, at 67–80; Pl.'s Exh. 120. But her testimony during the hearing regarding the September–October 1999 license revocation proceeding for North Vernon reveals that her desire to close the facility was based on the facility's substandard quality of care. Pl.'s Exh. 118, at 162–64; Defs.' Exh. 16, at 151–52. Moreover, there is no admissible evidence that Hornstein directed anyone to apply the handwritten criteria differently at Legacy facilities. In fact, the only admissible testimony regarding application of that crite-

ria suggests that it was applied by a team of people, none of whom are defendants here, equally to all facilities facing a potential charge of immediate jeopardy. Pl.'s Exh. 119, at 67–80.

Finally, none of the admissible evidence presented by Legacy about Hornstein's retaliatory motive is close in time to the alleged impetus for such behavior. Legacy contends that its litigation history in the period between 1988 and 1996 provided the motivation for retaliation. Except for her attendance at the November 6, 1996, meeting, none of Legacy's admissible evidence regarding Hornstein occurred less than two years after the allegedly problematic litigation. The distance in time, coupled with the circumstances discussed above, is too attenuated to raise a reasonable inference that Hornstein retaliated against Legacy because of its litigation history with FSSA and ISDH between 1988 and 1996.

Because it lacks evidence of retaliatory motive as to each individual, Legacy is left with its theory that Davis, the lawyer involved with litigation on behalf of the FSSA against Legacy prior to 1996, turned the other Defendants against it at the November 1996 meeting. But, Legacy's only evidence that its litigation caused Davis any distress was his observation of Davis' reaction to the joint stipulation reached in *Community Care Centers v. Indiana Family & Social Services,* Cause No. 18D02–9307–CP–121, on January 8, 1994. Bradburn Decl. ¶ 55. Bradburn declared that Davis was visibly upset by the outcome of that litigation.[12] *Id.* There is no other admissible evidence in the record that Davis felt any animosity toward Legacy. True, on or about April 4, 1997, Bradburn learned that Davis had contacted loan

---

**12.** The Court notes that this is a paraphrase of the actual content of Bradburn's declaration because what Bradburn actually asserts is inadmissible as outside Bradburn's personal knowledge and conclusory without additional evidentiary support.

officers at Bank One, Old National Bank, and National City Bank, who handled Legacy's accounts. Bradburn Decl. ¶ 98. Other than Bradburn's conclusory allegation that the purpose of those phone calls was nefarious, there is no evidence that Davis made the calls in retaliation for Legacy's litigation tactics during the period between 1988 and 1996, or for any other improper purpose. Likewise, there is no evidence in the record that leads to an inference that Davis convinced, told, or coerced any other Defendant to target Legacy because she was frustrated by Legacy's exercise of its First Amendment right to litigate. Without such evidence, Legacy's theory is unsupported by any reasonable inferences and it has failed to establish a material question of fact on the second element of its First Amendment retaliation claim.

Legacy uses the same evidence to support its contention that Davis, Mason, Hornstein and Coleman entered into an agreement, or created a conspiracy, at the November 1996 meeting to retaliate against it for exercising its First Amendment rights. For the same reasons, no reasonable jury could infer that these Defendants made such an agreement on that date or any date thereafter. The Court concludes that summary judgment is appropriate in favor of Davis, Mason, Hornstein and Coleman on Legacy's claims that Defendants retaliated and conspired to retaliate against Legacy for Legacy's exercise of its First Amendment right to litigate.

With respect to McGee, Legacy asserts that she evidenced retaliatory motive when she called FSSA's DDARS employee Chilton sometime prior to August 1999 and questioned DDARS' decision to continue placement of persons into New Horizon. Pl.'s Exh. 105, at 30. In addition, during a later conference call with Chilton's boss and McGee, Chilton recalls that McGee made a comment "something to the effect that if New Horizon spent more money on staff than litigation maybe they would be in better condition or shape, or something to that effect." *Id.* at 32. McGee does not recall making the statement. McGee Decl. ¶ 12; Defs.' Exh. 46, at 301. During that conference call McGee had also shared her concerns with Chilton about conditions at New Horizon; a legitimate reason for McGee at ISDH to contact DDARS, which is within FSSA. Pl.'s Exh. 105, at 30. McGee denies that she knew New Horizon was owned by Legacy at the time she allegedly made the comments, but Legacy presented evidence that calls into question McGee's credibility on that issue. *Compare* MGee Decl. ¶ 12, *with* Pl.'s Exh. 106. Legacy would have a jury draw from this exchange that, in her position as a Program Director in ISDH's ICF/MR–DD, McGee orchestrated the 1998–1999 New Horizon decertification action, and the subsequent actions in the same vein, in part because of Legacy's 1988 to 1996 litigation history with the State.

The Court concludes that this inference is unreasonable. First, the context of McGee's alleged statement is with respect to the 1998–1999 decertification action undertaken by ISDH at Legacy's New Horizon facility. There is no apparent connection to Legacy's litigation history in the 1988 to 1996 time frame and no facts to support such an inference.

Second, during the conference call in which McGee allegedly made the reference to litigation, she also clearly stated that her reason for concern that DDARS was placing individuals at New Horizon at that time was because of the survey results at the facility. Pl.'s Exh. 105, at 26. McGee reported that the conditions there were unsafe for residents. *Id.* There is no admissible evidence in the record that McGee improperly influenced the survey results at

New Horizon in late 1998 and early 1999 that led to her conclusion about the substandard level of care at New Horizon. Nor does the undisputed litigation history surrounding that particular action support such an inference. *Ind. State Dep't of Health v. Legacy Healthcare, Inc.*, 752 N.E.2d 185 (Ind.Ct.Ap.2001); Defs.' Exhs. 29, 31, 32, 36–39. The only reasonable inference is that McGee's purpose in calling Chilton to inform DDARS that is should not place residents at New Horizon was not to retaliate against Legacy for litigating, rather, her purpose was alert DDARS to the potential harm that could occur to future ICF/MR individuals if they were placed at New Horizon.

Even if McGee's comment to Chilton were enough evidence from which a jury could infer retaliatory intent on McGee's part, the record establishes that McGee had a legitimate reason to express her concern to DDARS about its placement of residents at New Horizon. There is no evidence to controvert McGee's statement that she was required to share information with DDARS about the quality of care at ICF/MR facilities. McGee Decl. ¶ 11. Furthermore, as stated above, the admissible evidence establishes that the surveys conducted by ISDH at the New Horizon facility that led to the 1998 decertification action were never found deficient by the Appeals Panel. Pl.'s Exh. 96. Rather, in June 1999, the Appeals Panel vacated the ALJ's finding on the matter and remanded it for further proceedings on the issue. *Id.* There is no evidence of the outcome on remand. Subsequent surveys conducted at the facility also indicate legitimate reasons for ISDH to be concerned about DDARS recommending individuals to New Horizon. Defs.' Exhs. 29–31. There is no admissible evidence to indicate that McGee had any undue influence on these survey results.

With respect to McGee, Legacy has failed to establish a material question of fact that McGee expressed concern to DDARS about placing residents at New Horizon or otherwise improperly influenced findings to support decertification actions against the facility in retaliation for Legacy's exercise of its First Amendment rights. Even if there were such material question of fact, Legacy has failed to rebut McGee's showing that she would have taken the same tact regardless of Legacy's First Amendment protected activity. For these reasons, summary judgment in favor of McGee is appropriate on Legacy's claim that she retaliated against it for exercising its First Amendment rights.

The Court notes that with respect to all Defendants, this case is unlike that in *Beechwood Restorative Care Center v. Leeds*, 436 F.3d 147 (2d Cir.2006), in which the Second Circuit found a material question of fact as to some defendants. In that case, in addition to the timing of the alleged increased scrutiny, there were e-mails or statements made by the defendants that could have led to an inference that the increased scrutiny was made for improper purposes. *Id.* at 153–54. For example, e-mail responses by department of health administrators upon receiving news that the facility's Medicare/Medicaid provider agreement would be revoked "rejoiced with exclamations of 'AMEN & HALLELUJAH' and 'HOT DIGGITY DAWG' (followed by 50 exclamation marks)." *Id.* at 153–54. In addition, in *Beechwood*, the director of the department of health was heard to say that the department's previous trouble with the facility was with lawsuits filed by a particular employee of the facility and they "'were going to get' [the employee] for it." *Id.* at 154. Other than the timing of the events that occurred at Legacy facilities in late 1996 and early 1997, there is simply nothing to link the Defendants' motivation to

Legacy's litigation in the 1988 to 1996 time frame. In addition, the evidence of suspicious timing is not enough to create a material issue of fact by itself.

In summary, Legacy has cited to no material facts that would support its First Amendment retaliation claim against Defendants Powers, Stark, Ellis and A. Connell. With respect to Defendants Mason, Davis, Hornstein and Coleman, Legacy has failed to evidence a material question of fact that Legacy's 1988 to 1996 litigation history with FSSA and ISDH motivated them to take the actions they did against Legacy facilities in late 1996 through 1999. Finally, with respect to Defendant McGee, Legacy has failed to evidence a material question of fact that Legacy's 1988 to 1996 litigation history with the State motivated McGee to take the actions she did in 1998 and 1999 against Legacy's New Horizon facility. Even if there is enough evidence to create such a material question of fact, there is no admissible evidence in the record to rebut McGee's showing that she would have taken the same actions regardless of Legacy's litigation history. For these reasons, summary judgment in favor of Defendants is appropriate on Legacy's First Amendment claim.

## D. VIOLATION OF THE EQUAL PROTECTION CLAUSE

Defendants also contend that summary judgment is appropriate on Legacy's equal protection claim. In large part, Defendants argue that Legacy has failed to evidence that similarly situated facilities were treated differently. Moreover, Defendants assert that Legacy has failed to provide any admissible evidence that Defendants treated it as a "class of one."

The Court notes that it has already ruled that Legacy's equal protection claim with respect to the North Vernon licensure action is precluded. Therefore, the Court only addresses Legacy's "class of one" arguments that Hornstein, Coleman and Mason refused to provide North Vernon a copy of its license, with no rational basis to do so; that McGee contacted DDARS regarding her concerns about placing patients at New Horizon; that Hornstein directed Powers, McGee, Ellis, A. Connell and Stark to broaden the scope of surveys at Legacy facilities to extend ongoing 180–day cycles that would wrongfully keep a facility out of compliance, thus triggering an 180–day cycle decertification process; [13] and that Hornstein, Coleman and McGee improperly issued a decertification letter to New Horizon in on April 8, 1998. Pl.'s Exh. 94.

The Seventh Circuit has recognized "class of one" claims in the equal protection context, although it has also " 'acknowledged that it is difficult to succeed with such a claim.' " *Maulding Dev., LLC v. City of Springfield*, 453 F.3d 967, 969–70 (7th Cir.2006) (quoting *McDonald v. Vill. of Winnetka*, 371 F.3d 992, 1001 (7th Cir.2004) (other citations omitted by Seventh Circuit)), *cert. denied* —— U.S. ——, 127 S.Ct. 944, 166 L.Ed.2d 705 (2007). To succeed on a "class of one" claim under the Equal Protection Clause of the Fourteenth Amendment, Legacy "must show (1) it has been intentionally treated differently from others similarly situated; and (2) there is no rational basis for the difference in treatment or the cause of the differential treatment is a 'totally illegitimate animus' toward [Lega-

---

**13.** The Court notes that Defendants do not address this allegation apparently because it is embedded in allegations within Bradburn's declaration rather than referred to in Legacy's brief. However, the allegation, although stated differently, is reasonably contained within Legacy's complaint, *see* Second Am. Compl. ¶¶ 44e; 103, therefore, the Court will consider it in this motion.

cy] by the [Defendants]." *Id.* at 970 (citing *Vill. of Willowbrook v. Olech,* 528 U.S. 562, 564, 120 S.Ct. 1073, 145 L.Ed.2d 1060 (2000) (per curiam); *Nevel v. Vill. of Schaumburg,* 297 F.3d 673, 681 (7th Cir. 2002)).

■ With respect to the first element, the Seventh Circuit "has imposed on plaintiffs a 'high burden' in establishing [an entity that] is similarly situated in ['class of one'] cases." *Id.* (quoting *Purze v. Vill. of Winthrop Harbor,* 286 F.3d 452, 455–56 (7th Cir.2002)). Although there is no precise formula to determine whether Legacy is similarly situated to its proffered comparators, "[t]o be considered 'similarly situated,' comparators must be '*prima facie* identical in all relevant aspects,' or 'directly comparable to [Legacy] in all material respects.'" *Racine Charter One, Inc. v. Racine Unified Sch. Dist.,* 424 F.3d 677, 680 (7th Cir.2005) (quoting *Purze,* 286 F.3d at 455–56, and *Ajayi v. Aramark Bus. Servs., Inc.,* 336 F.3d 520, 532 (7th Cir. 2003)). In other words, evidence of similarity "'requires some specificity.'" *Maulding Dev.,* 453 F.3d at 971 (quoting *Campbell v. Rainbow City,* 434 F.3d 1306, 1314 (11th Cir.2006)). "'[A] court may properly grant summary judgment where it is clear that no reasonable jury could find that the similarly situated requirement has been met.'" *Id.* at 970 (quoting *McDonald,* 371 F.3d at 1002).

First, Legacy has failed to assert any admissible factual allegations to substantiate its equal protection claim against Defendants Davis and Stark. As a result, its claim that Davis and Stark violated its right to equal protection must fail.

With respect to Legacy's allegation that Hornstein, Coleman and Mason refused to provide North Vernon a copy of its license, with no rational basis to do so, Legacy has failed to provide any admissible evidence that Mason or Coleman had anything to do

with such matters. Therefore, Legacy's allegation as to Mason and Coleman fails.

With respect to Hornstein, the analysis of intentional discrimination is not as clear cut. All letters regarding new or renewed licenses and the new or renewed licenses themselves had Hornstein's signature on them. *See* Pl.'s Exhs. 20, 22; Bradburn Decl. ¶¶ 141, 143–44. Moreover, at the meeting between ISDH, HCFA and Legacy in July 1998, Hornstein made statements that Legacy would be better served by focusing on rectifying the state's concerns at its facilities than it is by fighting them. Bradburn Decl. ¶ 125. Moreover, when asked why Legacy had not received the North Vernon license, Hornstein replied that it was because of pending litigation. *Id.* ¶ 127. But, Legacy has asserted that as to other of its facilities against which ISDH had pending license revocation actions, the pending litigation did not prevent Hornstein from issuing the license. Bradburn Decl. ¶¶ 141, 143–44; Pl.'s Exhs. 20–22. Further, during the September 27, 1999, hearing regarding North Vernon's license, Hornstein testified that she would do anything to revoke the license at North Vernon because the facility "[could] not maintain compliance and [could not] take care of its residents." Pl.'s Exh. 118, at 162. Hornstein testified during her deposition in the instant matter that she assumed that North Vernon's licenses were issued to Legacy and that she followed the law regarding such matters. Pl.'s Exh. 18, at 51–52, 105–06.

■ The problem with Legacy's argument is that it claims that it was discriminated against, but its only comparators is itself. The Court is not aware of any case in which a "class of one" claim has been allowed to proceed on that basis. In addition, although Legacy presents some evidence that its other facilities were similarly situated, there is little evidence to show

that the circumstances at those facilities were equally egregious to those at North Vernon. Further, there is no evidence to rebut Hornstein's testimony that she thought North Vernon's licenses would have issued to Legacy according to the law. Pl.'s Exh. 18, at 51–52, 105–06. Nor is there evidence to show that Hornstein directed her staff to process North Vernon's annual renewal paperwork differently than that for other facilities. Hornstein did express her desire to revoke North Vernon's license, but her testimony reflects that this desire arose, not from ill will or hatred of individuals at Legacy or Legacy as a company, but rather from concern that the North Vernon facility could not adequately care for its residents. Under the high burden set by the Seventh Circuit in "class of one" cases, the Court concludes that Legacy has failed to evidence a material question of fact that Hornstein intentionally withheld a license for North Vernon in violation of the Equal Protection Clause of the Fourteenth Amendment.

Turning to Legacy's allegation that McGee contacted DDARS regarding her concerns about placing patients at New Horizon, Legacy provides no admissible evidence that McGee treated any other facility about which she had concerns any differently than she treated New Horizon. As a result, the Court concludes that Legacy's equal protection claim against McGee based on her contact with DDARS must fail.

With respect to Legacy's remaining allegations Legacy has failed to provide admissible evidence that "*prima facie* identical" comparators were treated differently. Legacy's remaining allegations include that Hornstein directed Powers, McGee, Ellis, A. Connell and Stark to broaden the scope of surveys at Legacy facilities to extend ongoing 180–day cycles that would wrongfully keep a facility out of compliance, thus triggering an 180–day cycle decertification process; and that Hornstein, Coleman and McGee improperly issued a decertification letter to New Horizon on April 8, 1998.

Legacy claims that McGee's contact with DDARS about the New Horizon facility's substandard quality of care was unique to that facility, but it points to no evidence that McGee never contacted DDARS with similar concerns about other facilities.

Likewise, Legacy's cycle-breaking evidence regarding similarly situated facilities is devoid of details that are necessary for finding the facilities "*prima facie* identical" because the nature of the evaluation process is too complicated to cite mere generalities or conclusory statements. Legacy cites to four instances and two facilities that it contends were similar situations to what it faced at its own facilities.[14] Bradburn Decl. ¶¶ 152–58, 161–64; Pl.'s Exhs. 25–32. However, none of the instances occurred at a time frame similar to the ones Legacy complains of at its own facilities. *Compare, e.g.,* Pl.'s Exh. 25 (June 23, 1994, survey at Whispering Pines); Pl.'s Exh. 26 (October 27, 1995, survey at Arbors of Fort Wayne); Pl.'s Exh. 28 (January 18, 1996, survey at Arbors of Fort Wayne), *with, e.g.,* Bradburn Decl. ¶¶ 169–73 (discussing the Portland East issue starting in August 1996); *id.* ¶¶ 174–78 (discussing the Portland East issue starting in August 1997); *id.* ¶¶ 179–95, 199–201, 205; Pl.'s Exhs. 38 & 39 (discussing the Columbus issues starting on November 20, 1997); Bradburn Decl. ¶¶ 220–31 (discussing the New Castle issues beginning in July 1997); *id.* ¶¶ 24204, 247–50, 253 (dis-

---

**14.** The Court notes that it considered Legacy's evidence regarding similarly situated facilities over an objection by Defendants, making no ruling, until now, about the sufficiency of the evidence to raise a material question of fact.

cussing the Portland West issues beginning in May 1998).

The most closely similar situations to those at Legacy facilities with respect to dates are those at Arbors of Fort Wayne in April and June of 1996. *See* Pl.'s Exh. 31 (portion of April 10, 1996, Arbors survey); Pl.'s Exh. 32 (portion of June 17, 1996, Arbors survey). Those are closely related in time to the occurrences at Legacy's Portland East facility in August 1996. But even if these events are analogous in time, Legacy provides scant information about the nature of the allegations against the other facilities compared to those at Legacy facilities and little information about the severity level of those tags as compared to those at Legacy facilities. In other words, because the survey criteria is so complicated and the decisions based on observations at the facilities applying the criteria are purposefully subjective, Legacy has failed to provide enough detail for a jury to make a reasoned comparison.[15] *Cf. Maulding Dev.*, 453 F.3d at 971 (discussing the differences important to zoning decisions); *Racine Charter One*, 424 F.3d at 681–82 (discussing the subtle nuances that may make treatment of schools different). As a result, the Court concludes that this theory of Legacy's equal protection claim must fail as to all Defendants.

Lastly, with respect to Legacy's allegations that Hornstein, Coleman and McGee improperly issued a decertification letter to New Horizon on April 8, 1998, Legacy presents no admissible evidence of similarly situated facilities. As a result, the Court concludes that Legacy's equal protection claim fails on this theory as to all Defendants as well.

In summary, Legacy has failed to evidence a material question of fact on any of its allegations under the Equal Protection

Clause of the Fourteenth Amendment. As a result, summary judgment is appropriate in favor of Defendants Mason, Coleman, McGee, Powers, Stark, Ellis, A. Connell, and Davis on Legacy's equal protection claim. Because the Court has found no material issue of fact on Legacy's equal protection claim, Legacy's claim that Defendants Davis, Hornstein, Coleman, Mason, McGee and Powers conspired to deprive it of equal protection also must fail. Summary judgment on that claim is appropriate as to all Defendants.

### E. ABSOLUTE & QUALIFIED IMMUNITY

Defendants Mason and Davis contend that as legal representatives at all times relevant to Legacy's claims, they are entitled to absolute immunity. In addition, Defendants Hornstein, Coleman, McGee, Powers, Stark, Ellis and A. Connell contend that they are all qualifiedly immune from Legacy's claims. Although the Court has decided that Legacy has failed to evidence a material question of fact on its constitutional claims against any of Defendants, the Court will address their immunity arguments as an alternative basis for summary judgment.

With respect to Mason and Davis' argument that they are entitled to absolute immunity, the Court agrees that the admissible activities alleged by Legacy that were undertaken by Mason were actions within the scope of her regular advocacy functions for the State. *See Mendenhall v. Goldsmith*, 59 F.3d 685, 691 (7th Cir.), *cert. denied*, 516 U.S. 1011, 116 S.Ct. 568, 133 L.Ed.2d 492 (1995). As a result, Mason has absolute immunity from claims arising out of her actions. However, as for Davis, Legacy has alleged that Davis im-

---

**15.** Any alleged harm from an equal protection violation that might have occurred in 1996 is also time-barred by the two-year statute of limitations.

properly contacted its banks. Davis has stated that her contact of the banks was within the scope of her employment, however, there is nothing to suggest that her role in making such contacts was prosecutorial, rather it sounds more like an investigative activity. There is no absolute immunity for investigative activities, rather Davis "has only the protection of qualified immunity when functioning in the role of an administrator or investigative officer rather than an advocate." *Mendenhall,* 59 F.3d at 689. With respect to Legacy's admissible allegations that Davis' prosecutorial activities harmed Legacy, however, Davis is absolutely immune. *See id.*

■ Looking at qualified immunity for Davis, Hornstein, Coleman, Powers, Connell, Ellis, McGee and Stark, the Court must first determine whether a constitutional right has been violated. *See Alexander v. City of Milwaukee,* 474 F.3d 437, 444 (7th Cir.2007) (citing *Saucier v. Katz,* 533 U.S. 194, 201, 121 S.Ct. 2151, 150 L.Ed.2d 272 (2001); *Payne v. Pauley,* 337 F.3d 767, 775 (7th Cir.2003)). If there has been such a violation, or there is a question of fact on the issue, then the Court must examine whether the right was clearly established at the time of the violation. *See id.* "Qualified immunity protects officials from suit and from liability for civil damages when, *at the time of the alleged action,* the contours of the constitutional right were not so defined as to put the defendant on notice that their conduct amounted to a constitutional violation." *Id.* at 446 (emphasis in original) (citing *Hope v. Pelzer,* 536 U.S. 730, 739, 122 S.Ct. 2508, 153 L.Ed.2d 666 (2002)). In the instant case, the Court has determined that Legacy has failed to establish a material question of fact on whether Defendants violated its constitutional rights. Therefore, they are entitled to qualified immunity on Legacy's claims against them.

## VI. CONCLUSION

For the reasons stated above, Counts 5 through 8 of plaintiff's, Randall L. Woodruff, as Bankruptcy Trustee for Legacy Healthcare, Inc., Second Amended Complaint are **DISMISSED without prejudice;** the Court **GRANTS** Defendants', Jo Ann Mason, Gerald Coleman, Suzanne Hornstein, Clara McGee–Vinzant, Karen Powers, Robert Stark, Margaret Ellis, Avona Connell and Karen Davis, Motion for Summary Judgment on the remaining claims brought against them by plaintiff, Randall L. Woodruff, as Bankruptcy Trustee for Legacy Healthcare, Inc.

IT IS SO ORDERED.